UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
SITTING AT ROCHESTER

| | |
|---|---|
| GURINDER SINGH BAINS, as Personal Representative of the ESTATE of JASWINDER SINGH, deceased, HARPREET SINGH and his wife, DILPREET KAUR, and LAKHWINDER KAUR,<br><br>    Plaintiffs,<br><br>v.<br><br>AMERICAN TACTICAL, INC., ANTHONY DICHARIO, JOSEPH CALABRO, SCHMEISSER GMBH, and 365 PLUS D.O.O.<br><br>    Defendants. | Civil Action No.<br><br>Jury trial requested. |

## <u>COMPLAINT</u>

Plaintiffs, Gurinder Singh Bains, as Personal Representative of the Estate of Jaswinder Singh, Harpreet Singh and his wife Dilpreet Kaur, and Lakhwinder Kaur (collectively, the Plaintiffs) bring this action for negligence, public nuisance, and unlawful marketing against Defendants American Tactical, Inc., its president Anthony DiChario, its marketing director Joseph Calabro, Schmeisser GmbH, and 365 Plus d.o.o. (collectively, the Defendants), alleging the following:

### INTRODUCTION

1.      "No honest man needs more than 10 rounds," said famed firearms manufacturer and designer William B. Ruger, Sr., over 30 years ago.

2.      Ruger also stated, "I never meant for simple civilians to have my 20- or 30-round magazines . . . ."

3.     A magazine is the accessory used to store and feed ammunition in semi-iautomatic and automatic guns.  Rounds, or cartridges, are ammunition—what contains the bullet that is fired from a gun.  The high-capacity ammunition magazines (HCMs) that Mr. Ruger found unnecessary for law-abiding civilians enable many rounds to be fired from semi-automatic guns without reloading.

4.     HCMs are not necessary, or even useful, for lawful self-defense or hunting. They are, however, very useful for killing large numbers of people quickly, before the user can be stopped as he reloads.

5.     While soldiers in a combat zone may need to shoot many people quickly, HCMs in the civilian context are, as a practical matter, useful only to engage in mass assaults on other civilians or law enforcement—that is, mass shootings.

6.     This case is about what happens when companies recklessly design, market, sell, and distribute these accessories to the general public—indiscriminately—and without adherence to reasonable safeguards.

7.     While some debate the exact number of rounds beyond which an HCM becomes an unreasonably dangerous and unnecessary firearms accessory that poses an unacceptable risk to public safety relative to any nominal benefit, an HCM containing 60 rounds manifestly exceeds the threshold of unreasonableness.

8.     A 60-round HCM's meaningful utility is limited to military assaults or their civilian equivalent—mass shootings.

9.     A 60-round HCM has no use for law-abiding civilians employing fire-arms for legitimate purposes such as self-defense, hunting, or sport shooting at inanimate targets.

10.     Defendants knew that HCMs have been used repeatedly to slaughter and terrorize Americans in horrific mass shootings since long before April 2021. They knew that mass killers are attracted to HCMs, because they generate maximum killing power in a very short time.

11.    Despite awareness of the above risks, Defendants deliberately marketed and sold HCMs to the general public--and not just any HCM, but 60-round magazines that have approximately six times the killing capacity of standard magazines.  Defendants sold these HCMs without a single safeguard, screening, or limit. Indeed, these HCM's are available for purchase at the click of a button on the internet marketplace—where criminals flock due to anonymity and lack of reasonable controls.

12.    A company that imports, manufactures, distributes, or sells highly lethal products to civilians owes a duty to the public to be particularly careful about whose hands those products end up in.

13.    Yet Defendants, when faced with the decision to act responsibly, instead took a hard turn and specifically targeted these highly lethal products to a consumer base filled with impulsive young men who feel they need to harm others in order to prove their strength and who have militaristic delusions of fighting in a war or a video game—young men like the mass shooter here, who murdered eight innocent people and wounded five others in a mere four minutes (Shooter).[1]

14.    Instead of minimizing the serious risk that their HCMs would be acquired by and misused by violent criminals, Defendants breached their duty of care by significantly increasing the risk that one or more of their HCMs would be used in a mass shooting.

15.    Defendants did so through several reckless practices (described in greater depth below), including, but not limited to:

  a. selling HCMs with a 60-round capacity;

  b. allowing customers to acquire HCMs without providing any legitimate reason for needing an HCM for law-abiding activities;

---

[1] This complaint refers to this individual in generic terms so as to avoid giving notoriety to criminals.

    c.    allowing customers to acquire HCMs without engaging in any face-to-face transactions with any Federal Firearms Licensee (FFL);

    d.    allowing customers to acquire HCMs without providing their criminal history or completing a mental health screening;

    e.    affirmatively marketing HCMs in a manner that they knew, and intended, would target these highly lethal products to young men with delusions of fighting in a war, an obsession with video games, and insecurities regarding their masculinity (*i.e.*, the need to harm others in order to prove their strength).

16. Defendants' reckless actions directly and foreseeably channeled a 60-round HCM into the hands of the Shooter or somebody like him. The Shooter did exactly what Defendants knew or should have known one of its customers would do: he combined the HCM with an AR-15 style firearm (the Firearms)[2] to perpetrate a mass shooting. This shooting was in Indianapolis, Indiana on April 15, 2021 (the Attack).

17. The Shooter armed himself with multiple HCMs but emptied a 60-round Schmeisser HCM (the Magazine) early in the Attack. Use of the Magazine enabled the Shooter to fire all 60 rounds in a matter of seconds.

18. Thirteen people were shot during the Attack. Eight died.

19. Among the victims were Jaswinder Singh (deceased) and Plaintiffs Harpreet Singh and Lakhwinder Kaur.

---

[2] Two AR-15 style rifles were recovered at the scene of the Attack.

20.     Jaswinder Singh had been working at FedEx for 10 days and was waiting to pick up his first paycheck when a high-velocity caliber bullet fired by the Shooter penetrated his lower left back, traveling through his body and out his front right flank, killing him. Jaswinder Singh is survived by his wife of over 50 years, his children, and grandchildren.

21.     Harpreet Singh, a husband and father of three, had been working at the FedEx facility for 6 months. Harpreet had just finished his shift and was standing in line to pick up his paycheck when he heard the first shot. The bullet struck him in the head and lodged in his temple. Blood ran down his face as he jumped over a walled security area to hide; huddled and silent,—he waited for the shooting to end and hoped not to lose consciousness.

22.     Lakhwinder Kaur had been working at FedEx since June 2020. She had just arrived for her shift and was sitting in a chair near the line for paycheck pick-up when she heard pops that sounded like fireworks and saw people running. When Lakhwinder Kaur saw a co-worker slump over, she attempted to go to him to offer aid when a bullet shot past her lacerating her left arm. Others yelled at her to lie down, so she briefly took shelter under a chair before she moved with coworkers into an office to hide.  One lady was wailing, unable to compose herself.  Others were banging on the door to be let in. After what seemed like an eternity, law enforcement arrived and led Lakhwinder Kaur and her coworkers outside the building.

23.     These brief summaries are not intended to fully capture the Plaintiffs, the damage they have sustained, or the terror they endured.

24.     Upon information and belief, Defendants continue to market and sell the Magazine and will ship it straight to anyone who can access the internet and pay $49.95 plus tax and shipping.

25.     The lethality of the Attack would not have been possible without the Magazine.

26.     The Shooter needed the HCM to accomplish his mission to kill and terrorize as many people as possible.

27.     The high capacity of the Magazine emboldened the Shooter to commit the Attack, knowing he had the ability to fire 60 rounds continuously without the need to pause to reload.

28.     Defendants not only made the Magazine easily and anonymously accessible to the Shooter, Defendants also targeted a dangerous class of individuals, which included the Shooter, with their reckless marketing campaign.

29.     Upon information and belief, the Shooter would not have selected or utilized the HCM in the attack but for the Defendants' negligent or unlawful design, marketing, or sales practices.

30.     Plaintiffs are entitled to damages for the harm foreseeably flowing from the Defendants' reckless conduct in the manufacturing and/or importing, selling, distributing, and marketing of the Magazine, as well as to injunctive relief to abate the ongoing nuisance created by Defendants' continuing conduct with regards to similar 60-round HCMs.

31.     This lawsuit does not in any way challenge the right of law-abiding citizens to bear arms for self-defense.

32.     This lawsuit also does not challenge in any way the right of responsible manufacturers, distributors, and sellers of firearms or reasonable firearms accessories to conduct business while complying with all aspects of their duty of care to the public and applicable state and federal laws.

33.     Instead, it seeks only to hold the Defendants accountable for their negligent, reckless, and unlawful conduct, which foreseeably resulted in the unlawful use of its Magazine to effect mass killing.

## PARTIES

34.     Plaintiff Gurinder Singh Bains is the Personal Representative of the Estate of Jaswinder Singh, deceased. Gurinder Singh Bains was at all relevant times a resident of Greenwood, Johnson County, Indiana.  Gurinder Singh Bains is the surviving son of Jaswinder Singh.   Jaswinder Singh was, prior to his death, lawfully admitted for permanent residence in the United States and domiciled in Greenwood, Johnson County, Indiana.

35.     Plaintiff Harpreet Singh was at all relevant times a citizen of Indiana, domiciled in Avon, Hendricks County, Indiana.

36.     Plaintiff Dilpreet Kaur was at all relevant times the lawful spouse of Harpreet Singh, and a citizen of Indiana domiciled in Avon, Hendricks County, Indiana.

37.     Plaintiff Lakhwinder Kaur was lawfully admitted for permanent residence in the United States and domiciled in Indianapolis, Marion County, Indiana at the time of the Attack. Lakhwinder Kaur is currently domiciled in Bakersfield, Kern County, California.

38.     Defendant American Tactical, Inc., (American Tactical) is a New York corporation with its principal place of business located at 231 Deming Way, Summerville, South Carolina 29483.

7

39.     Defendant American Tactical is an importer, manufacturer, and seller of firearms, ammunition, and accessories, including the ATI Schmeisser AR15 60 Round Magazine that was used by the Shooter in the Attack.

40.     Defendant American Tactical is the exclusive United States importer of Schmeisser magazines.

41.     Upon information and belief, Defendant American Tactical imported, marketed, distributed, and sold the Magazine, either directly or through one or more intermediaries, to the Shooter, and other similar magazines, to members of the general public.

42.     Defendant Anthony DiChario (DiChario) is the President of Defendant American Tactical. As president of American Tactical, upon information and belief, DiChario is aware of or ultimately approves American Tactical's marketing. As president, he has the ultimate authority to influence and direct American Tactical's marketing strategy and to cease running specific advertisements or other content published by American Tactical on its social media platforms.  Defendant DiChario also owns a firearms distribution company, AmChar Wholesale, Inc. (AmChar), also located at 100 Air Park Drive, Rochester, New York, 14624.

43.     Upon information and belief, Defendant DiChario is a citizen of the State of New York.

44.     Defendant Joseph Calabro (Calabro) is the Director of Marketing and Purchasing for American Tactical. Upon information and belief, he oversees and

directs American Tactical marketing, including on its social media platforms. Calabro is also Director of Marketing and Purchasing at AmChar.

45.    Upon information and belief, Calabro is a citizen of the State of New York.

46.    Defendant Schmeisser GmbH (Schmeisser) is a German corporation that manufactures firearm accessories, weapon system components, and firearms, including AR-15 style rifles, and has a principal place of business in Krefeld, Germany. Schmeisser uses Defendant American Tactical as its sole importer and distributor for the United States market.

47.    Defendant 365 Plus d.o.o. (365 Plus), is a Slovenian corporation that designs, manufactures, and distributes firearms accessories. Upon information and belief, Defendant 365 Plus acted as a global distributor for Schmeisser firearm accessories, including its 60-round rifle magazines.

48.    Defendant Schmeisser manufactured the Magazine and distributed it into the United States through Defendants American Tactical and 365 Plus.

### JURISDICTION AND VENUE

49.    This Court has jurisdiction over this matter under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

50.    This Court has personal jurisdiction over Defendant American Tactical pursuant to 28 U.S.C. 1441 because American Tactical is incorporated in the State of New York.

51.    Venue is proper in this Court as American Tactical has itself sued others in federal courts in this jurisdiction on prior occasions.

52.    This Court has personal jurisdiction over Defendant DiChario as DiChario is, upon information and belief, a resident of this district.

53.    This Court has personal jurisdiction over Defendant Calabro as Calabro is, upon information and belief, a resident of this district.

54.    This Court has personal jurisdiction over Defendant Schmeisser as Defendant Schmeisser has substantial and purposeful contacts with New York, and the causes of action arise out of or relate to those contacts.

55.    This Court has personal jurisdiction over Defendant 365 Plus as Defendant 365 Plus has substantial and purposeful contacts with New York, and the causes of action arise out of or relate to those contacts.

56.    Thus, venue and jurisdiction are proper in this Court.

## GENERAL ALLEGATIONS

### A.    DEFENDANTS' HCMS ARE UNREASONABLY DANGEROUS FIREARMS ACCESSORIES THAT ENABLE UNLAWFUL MASS SHOOTINGS LIKE THE ATTACK WHEN SOLD TO CIVILIANS

57.    Defendants market, import, manufacture, distribute, and sell HCMs like the Magazine as firearms accessories for members of the civilian public to add as accessories to guns so that they can fire 60 rounds without reloading.

58.    A 60-round HCM like the Magazine is not a component part of a firearm.

59.    Upon information and belief, the Magazine was not sold or packaged with a firearm.

60.    Upon information and belief, Defendants' 60-round HCMs are rarely sold or packaged with any firearm.

61.    A 60-round HCM is not essential to the discharge of a gun.

62.     Indeed, a gun like the Firearm can and will fire with a smaller magazine or with no magazine attached but a round in the chamber.

63.     The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) labels HCMs as "firearm accessories."

64.     HCM accessories are useful when combined with guns—especially military-style assault firearms like AR-15-style guns—to inflict a high number of casualties in a short period without the need to constantly reload the weapon.

65.     For the civilian market, the only people who need HCMs are mass killers.

66.     Defendants have long known that mass killers are attracted to buy HCMs, and that this group uses HCMs to commit horrific, mass slaughters.

67.     These incidents include, but are not limited to:

    a.     On August 4, 2019, a shooter armed with an AR-15 style rifle and a 100-round magazine attacked a crowd in an entertainment district of Dayton, Ohio, where he killed nine people, while wounding 17 others.

    b.     On July 28, 2019, a shooter armed with an AK-47-style rifle, a 75-round drum magazine and multiple 40-round magazines attacked a festival in Gilroy, California, where he killed 3 people, while wounding 13 more.

    c.     On November 7, 2018, a shooter armed with a pistol and multiple 30-round magazines attacked a bar and grill in Thousand Oaks, California, where he killed 11 people.

    d.     On February 14, 2018, a shooter armed with an AR-15-style rifle and several 30- or 40-round magazines attacked the Marjory Stoneman Douglas High School in Parkland, Florida, where he killed 17 people, while wounding 17 more.

e.     On November 5, 2017, a shooter armed with an AR-15-style rifle and around 15 30-round magazines attacked a church in Sutherland Springs, Texas, where he killed 26 people, while wounding 20 more.

f.     On October 1, 2017, a shooter armed with multiple firearms – including several AR-15-style rifles – twelve 100-round magazines and a 40-round magazine attacked a music festival in Las Vegas, Nevada, where he killed 58 people, while wounding hundreds.

g.     On June 12, 2016, a shooter armed with multiple firearms – including an assault-style rifle – and multiple 30-round magazines attacked a nightclub in Orlando, Florida, where he killed 49 people, while wounding 53 more.

h.     On December 2, 2015, two shooters armed with multiple AR-15-style rifles and four 30-round magazines attacked a regional center in San Bernadino, California, where he killed 14 while injuring 21.

i.     On June 7, 2013, a shooter armed with multiple firearms -- including an AR-15-style rifle – and 40 30-round magazines attacked a college in Santa Monica, where he killed 5 people.

j.     On December 14, 2012, a shooter armed with multiple firearms – including an AR-15-style rifle – and one or more 30-round magazines attacked an elementary school in Newtown, Connecticut, where he killed 27 people (including 20 children).

k.     On July 20, 2012, a shooter armed with multiple firearms – including an AR-15-style rifle – and at least one 100-round and one 40-round magazine attacked a movie theater in Aurora, Colorado, where he killed 12 people, while wounding 58 more.

68.     In addition to these specific, illustrative examples, a publicly available analysis released by Everytown for Gun Safety on March 22, 2019 surveyed mass shootings from 2009-2017 and found that 58% of mass shootings with known magazine capacity data involved firearms with HCMs.

69.     Mass shooters disproportionately use HCMs like the Magazine in part because the large volume of rounds minimizes the number of times a shooter must pause and reload.

70.     The scarcity of reloading intervals decreases opportunities for victims to escape or fight back and makes it harder for law enforcement to intervene to stop the shooter.

71.     This helps explain why mass shootings involving HCMs, on average, result in over two times as many deaths and over 14 times as many injuries as mass shootings that do not involve HCMs.

72.     Upon information and belief, because many mass shooters delusionally seek fame or glory by maximizing their number of victims, a lack of access to HCMs, which often enable a high casualty count, would cause many potential mass shooters to delay or cancel planned attacks.

73.     This would, in turn, provide crucial opportunities for law enforcement or others to intervene before these individuals commit any violent crimes.

74.     While HCMs are useful to effectively engage in mass slaughters, they are unnecessary for lawful self-defense or hunting, and are, in practice, very rarely used for legal self-defense.

75.     This reality was recently illustrated by the evidence presented in two separate challenges to state HCM restrictions preceding the Attack.

76.     Specifically, in *Colorado Outfitters Ass'n,* the District Court of Colorado, in rejecting a Second Amendment challenge to Colorado's HCM ban, found that:

> No evidence presented here suggests that the general ability of a person to defend him or herself is seriously diminished if magazines are limited to 15 rounds. Despite more than 40 years instructing individuals and law enforcement in defensive firearm use, the Plaintiffs' expert witness . . . identified only three anecdotal instances in which individuals engaging in defensive use of firearms fired more than 15 rounds.

*Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1069 (D. Colo. 2014), vacated and remanded, 823 F.3d 537 (10th Cir. 2016).

77.     The court further underscored that "of the many law enforcement officials called to testify, none were able to identify a single instance in which they were involved where a single civilian fired more than 15 shots in self-defense." *Id*. at 1069-1070.

78.     An expert report in that litigation noted that analyses of two sets of hundreds of self-defense uses of firearms had both found the average number of shots fired in self-defense to be just over two. *Id.,* Exp't Rep. of Jeffrey Zax, Ph.D. at 5-6.

79.     Similarly, in *Duncan v. Becerra,* 366 F. Supp. 3d 1131 (S.D. Cal. 2019), an expert review of 736 incidents of self-defense revealed that a defender had fired over 10 rounds only twice, and that the average number of shots fired was just over two.

80.     There have been no incidents of which Plaintiffs are aware in which a 60-round HCM was needed—or even used—by a law-abiding person for lawful self-defense or protection.

81.     In nearly all realistic scenarios, a 60-round HCM is unnecessary for the lawful use of a firearm in self-defense.

82.     Gun rights advocate David Kopel, in testimony before the Senate Judiciary Committee, agreed with this conclusion (as it regards slightly larger magazines) when he testified that "[h]undred round magazines are novelty items, and are not standard for self-defense by civilians or police."

83.     A 60-round HCM is also not only unnecessary but even counter-productive for hunting game.

84.     This is because firing scores of rounds at an animal target will effectively disintegrate the animal and make eating or mounting the animal carcass all but impossible.

85.     Jim Webber, a Michigan gun owner, hunter, and sportsman, made the lack of application of HCMs in the hunting context clear in an op-ed where he called HCMs "weapons of mass destruction" and advised that Michigan's "magazine limits do not detract from either the hunting or recreational shooting experience and most likely enhance the sportsmanship and safety of both."

86.     A 60-round HCM like the Magazine, when sold to civilians, has but one meaningful application in the civilian world: to facilitate unlawful, offensive military-style combat missions by allowing individuals like the Shooter to kill or maim large numbers of people in a short time.

87.     There is overwhelming consensus supported by clear data that a 60-round HCM like the Magazine is unreasonably dangerous to distribute, market, or sell to the general civilian public.

**B.     DEFENDANTS ASSUMED A DUTY TO EXERCISE THE HIGH-EST DEGREE OF REASONABLE CARE IN REGARD TO FIRE-ARMS ACCESSORIES.**

88.     Defendants, when they chose to enter the business of marketing, manufacturing, distributing, or selling lethal firearms accessories, voluntarily assumed a duty to take every reasonable step to minimize the likelihood that products like the Magazine would be misused in an unlawful act of violence like the Attack.

89.     This duty is multifaceted.

90.     One key aspect of this duty was an obligation to never place a firearm accessory on the market whose benefits to lawful firearms owners were non-existent or, at best, negligible in comparison to the threat the accessory posed to public safety.

91.     However, because the Defendants decided to sell or distribute HCMs to the public anyway, they were obligated to implement protocols or safeguards to minimize to the greatest extent possible individuals like the Shooter from acquiring inherently dangerous products like the Magazine.

92.     Another aspect of that duty is to follow all applicable laws, including not causing a public nuisance in violation of New York common law and Indiana Code § 32-306-6.

93.     The duty also includes a requirement to market and advertise their products responsibly and not falsely or deceptively in violation of New York's Unfair Trade Practices Act ("NYUTPA") N.Y. Gen. Bus. Law § 349-350.

94.     The duty to implement reasonable safeguards—both for their own direct sales from their website and for downstream retail sellers of Schmeisser, American Tactical, or 365 Plus products--include, but are not limited to:

    a.     requiring all transfers of HCMs to be conducted face-to-face in person by an FFL;

16

b.      conducting criminal history, substance abuse, and mental health background checks or screenings on all prospective purchasers of HCMs;

c.      requiring all prospective purchasers of HCMs to certify that they are not disqualified from owning firearms under any provision of state or federal law;

d.      requiring all prospective purchasers of HCMs to certify that they are the actual end user of the firearm accessory (rather than buying the firearm accessory on behalf of another);

e.      requiring any prospective customer of an HCM to provide a legitimate, verifiable reason for needing an HCM and only transferring HCMs when they have reasonable grounds to believe the prospective purchaser actually has a legitimate, verifiable intended use for the HCMs;

f.      continually monitoring information from law enforcement, the media and other sources about the misuse of Schmeisser, American Tactical, or 365 Plus products like the Magazine in acts of gun violence, and adjusting business practices whenever such information indicates that aspects of their existing business practices might have enabled a dangerous product to fall into the hands of a criminal actor;

g.      only providing HCMs to retail sellers or downstream distributors who commit to each of the safeguards described above;

h.      exercising oversight to verify that all retail sellers and downstream distributors of Schmeisser, American Tactical, and 365 Plus products like the Magazine are, in fact, complying with safeguards like those listed above and terminating business

relationships or otherwise disciplining downstream actors who are not in compliance with these safeguards; and

i.    avoiding marketing practices reasonably likely to appeal to dangerous classes of people like the Shooter.

95.    On information and belief, Defendants failed to implement any such safeguards or screening.

96.    Additionally, as shown below, Defendants have made the decision to market their HCMs in whichever ways will result in the most sales, even if its marketing attracts a dangerous category of individual.

**C.    DEFENDANTS MARKETED AND DESIGNED THE MAGAZINE IN A WAY THAT FORESEEABLY ATTRACTED AND ENABLED DANGEROUS INDIVIDUALS LIKE THE SHOOTER.**

97.    Defendants breached their duty to use reasonable care in marketing, advertising, and promoting their HCMs.

**a.    DEFENDANTS' MARKETING ATTRACTED A DANGEROUS CATEGORY OF CONSUMER.**

98.    When Defendants marketed the Magazine, they knew or should have known of the existence of a category of consumers containing individuals like the Shooter, who would be attracted to such a weapon accessory and could pose a tremendous risk to the safety of others—namely impulsive young men with insecurities regarding their masculinity (*i.e.*, the need to harm others in order to prove their strength), militaristic delusions, and suicidal ideations attracted to using the particularly high lethality of HCMs like the Magazine to effectively execute their fantasies.

99.    Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of

the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky, destructive, impulsive, and sociopathic behavior. Moreover, emotions such as anger, depression, alienation, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.

100.    Scientifically based studies have further shown that this susceptibility to and predilection for risky, thrill-seeking behavior extends to violent criminal behavior. Indeed, a disproportionate amount of violent crime in the United States is committed by individuals between the ages of 15 and 24, and 18- to 20-year-olds commit gun homicide at a rate nearly four times higher than adults 21 and older.

101.    Adolescents and young adults also exhibit increased susceptibility to advertisements, and research indicates that they are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior. For instance, companies promoting products such as tobacco and alcohol have exploited the vulnerability of young consumers to advertisements that promote thrill-seeking conduct in order to draw them in early and convert them into lifelong purchasers of their products.

102.    Research further suggests that one propensity can feed the other: young people may be particularly responsive to advertisements portraying impulsive or risky behavior when they are in a negative emotional state involving, for instance,

depression, alienation, or anger. As studies have shown, such young people are more vulnerable to acting on impulse to seek immediate gratification.

103.   For individuals with risk factors for violence, particularly emotionally troubled young men, the physical presence of assault weapons, HCMs, and related imagery make violent actions more likely. The medical literature describes a "weapons effect," wherein the physical presence of a firearm may incite aggressive cognition and provoke violent behavior. Violence has infectious qualities: individuals may emulate previous killers or violent acts they have observed, a concept known as "identification." Assault weapons advertisements also activate people who are predisposed to violence but might not engage in it if they did not have access to the weapons or accessories.

104.   Despite this troubling information, Defendants target their advertising and marketing to exactly this vulnerable group: emotionally troubled young men. Defendants do so even though, as participants in a highly profitable, but uniquely dangerous market, they can reasonably be expected to be fully aware of these facts.

**b.   DEFENDANTS' USE OF VIDEO GAME AND ACTION MOVIE AESTHETIC.**

105.   Defendants, instead of acting carefully when marketing and selling their highly lethal HCMs to civilians to minimize the likelihood that they did not fall

into dangerous hands, published video advertisements on social media platforms of their HMCs featuring extreme violence and reckless spraying of bullets.

106.    The marketing videos were produced by firearms media production company Polenar Tactical.

107.    Defendant American Tactical posted two marketing videos for the Schmeisser HMCs to its YouTube page.

108.    Defendant American Tactical posted one of the video advertisements, titled "Polenar Tactical x Schmeisser Germany x ATI presents the AKS60," on March 30, 2021—two weeks before the Attack on April 15. The tag line for the advertisement is: "Schmeisser and ATI, in partnership with Polenar Tactical, are happy to present the first action footage of the Schmeisser AK S60 magazine. … Enjoy!" It is an advertisement for the Schmeisser 60-round magazine for AK-47 assault rifles.



109.   It depicts various men dressed in tactical vests like the Shooter wore during the Attack firing a constant stream of bullets at unseen targets in various offensive, tactical operations, as depicted in the screenshots below.







110.    Another video advertises the specific model of Magazine bought and used by the Shooter in the Attack, the Schmeisser Gen II 60-round magazine. It is titled "Introducing the Gen II Schmeisser 60rd magazine." The tag line for the video advertisement is: "American Tactical, Inc. is the exclusive distributor for the Schmeisser 60 rd magazine. Thank you to the entire team at Polenar Tactical for producing this great video of the magazine in action!"



111.    The current American Tactical YouTube URL for this video advertisement displays: "This video has been removed for violating YouTube's Community Guidelines." youtube.com/watch?v=FBZHVyS_77E, but is still published elsewhere on YouTube with a link to American Tactical's website.

112.    That video advertisement, in the style of a trailer for a violent video game or action movie, is set over an audio track that begins with tense, ominous tones before dropping to inspirational and nationalistic music and a continuous barrage of gunfire beginning with the first click of the Schmeisser Gen II 60-round magazine into the characters' assault rifles. Thus, begins imagery of two men, dressed in the same tactical vests that the Shooter wore during the Attack, engaging in an offensive, tactical shooting operation. The video shows a reckless, continual spray of bullets,

some slow-motion action shots, and the characters moving in to attack and shoot un-seen targets. The staccato of gunfire—displaying the ability to use the Schmeisser HCMs for continuous, rapid gunfire without a need to reload—and the raining of shells toward the end of the video reaches a crescendo while the shooter sprays bullets into a dark void and turns to the viewer to grin. Various screenshots of this video depict these sequences.







113.    Defendant American Tactical published these video advertisements and established a marketing presence on social media platforms like YouTube that are disproportionately visited by adolescent consumers.

114.    Defendant 365 Plus also published the above video advertisement to its YouTube page, at youtube.com/watch?v=RGuL0qoVJLo, with the following

leaderboard added to the video advertisement:



      c.    **THE SHOOTER FELL WITHIN THE DANGEROUS CATEGORY OF CONSUMERS AND WAS FORESEEABLY MOTIVATED BY DEFENDANTS' MARKETING AND DESIGN.**

115.    The Shooter fell within the dangerous category of consumers targeted by Defendants' extreme and deceptive marketing tactics.

116.    The Shooter, depicted in the photograph below, was 19 years old.



117.    The Shooter obsessively played video games and also consumed social media, including YouTube.

118.    The Shooter had been in treatment for severe and readily noticeable and observable mental health problems.

119.    At a press conference after the Attack, local and federal officials said the Attack was "an act of suicidal murder" in which the Shooter decided to kill himself "in a way he believed would demonstrate his masculinity and capability while fulfilling a final desire to experience killing people."

120.    A federal agent also said the Shooter aspired to join the military. Authorities added that he had been eating MREs, or meals ready-to-eat, like those consumed by members of the armed forces.

121.    Notably, during the Attack, the Shooter wore a tactical vest nearly

identical to the gear used in Defendants' video advertisement by individuals engaged in an offensive, tactical, combat-like operation.

122. Upon information and belief, the Shooter watched Defendants' video advertisements.

123. Upon information and belief, the Shooter was thus foreseeably motivated by Defendants' marketing and design to purchase the Magazine and use it to carry out the Attack.

### D. DEFENDANTS HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE, SINCE BEFORE 2021, THAT VIOLATING THEIR DUTY OF CARE WOULD LIKELY RESULT IN A MASS SHOOTING LIKE THE ATTACK.

124. Upon information and belief, all of the Defendants had actual or constructive knowledge that violations of their duty of care by marketing, manufacturing, distributing, or selling products like the Magazine without reasonable safeguards and in violation of Indiana and New York public nuisance laws and NYUTPA would likely result in one or more of their products being used in one or more mass shootings like the Attack.

125. The basis for this actual or constructive notice includes, but is not limited to, a lengthy string of widely publicized mass shooting incidents throughout the United States in which shooters used HCMs to engage in mass slaughter.

126. Further, upon information and belief, Defendants are aware that many states have banned HCMs because of the unreasonable dangers they pose. For the same reason, law enforcement has long called for sales of HCMs to be banned for civilians, and those demands helped lead to a federal ban on HCM sales from 1994 - 2004.

### E. DEFENDANTS VIOLATED THEIR DUTY OF CARE IN WAYS THAT DIRECTLY AND FORESEEABLY CHANNELED THE

**MAGAZINE TO THE SHOOTER AND CAUSED PLAINTIFFS' HARM.**

127.    Despite their actual or constructive knowledge that violation of one or more aspects of their duties of care would create a significant risk that a highly dangerous product like the Magazine would be used to perpetrate a mass shooting like the Attack, Defendants violated one or more aspects of their duty of care in ways that directly and foreseeably led to the Attack.

128.    First, Defendants unreasonably manufactured, distributed, or sold 60-round HCMs with full awareness that 60-round HCMs have no or negligible utility for lawful uses of firearms, but pose a tremendous risk to public safety because they are extremely effective and desirable for use in mass shootings.

129.    Had Defendants not violated their duty of reasonable care by placing an unreasonably dangerous product on the market, the Shooter would never have gained access to the Magazine.

130.    Second, upon information and belief, none of the Defendants implemented any reasonable safeguards or protocols to screen out potentially dangerous purchasers (such as those described in this Complaint).

131.    Upon information and belief, Defendants know that criminals, including mass killers, are attracted to the Internet because of its anonymity and lack of regulation.

132.    Defendants nonetheless sell HCMs online, without any safeguards, screening, or reasonable conditions.

133.    Anyone, regardless of age, criminal history, or mental health history, can buy an HCM like the Magazine used in the Attack directly off of Defendant American Tactical's website. Defendant American Tactical makes no further inquiry about the buyer or the purpose for buying an HCM before selling it through its website and includes no screening whatsoever prior to purchase.

134.    Similarly, Defendant American Tactical sells its HCMs like the

Magazine used in the Attack through other online firearms websites, also without any limitations, screening, or further inquiry.

135.    Had the Defendants complied with their duty of care by implementing some limitations on their own retail sales or by supervising their chains of distribution so as to require the retail sale of their products to be governed by such reasonable procedures, the Shooter would, upon information and belief, not have had access to the Magazine because such safeguards would have blocked him from acquiring the Magazine.

136.    Specifically, *inter alia*, had the Defendants required all transfers of HCMs to be face to face in person, required mental health screenings, or required all purchasers to provide a legitimate, verifiable, and credible reason for needing and HCM, the Shooter would not have legally acquired the Magazine.

137.    Defendants additionally breached their duty of care by aggressively marketing their HCMs in a manner designed to disproportionately appeal to and influence dangerous people like the Shooter.

138.    Finally, had the Defendants similarly complied with applicable state and federal laws, including, but not limited to New York's and Indiana's prohibitions on the creation of public nuisances by acting responsibly in controlling their chains of distribution and New York's Unfair Trade Practices Act prohibiting false and deceptive marketing, the Shooter also would not have legally gained access to the Magazine.

139.    It was eminently foreseeable that Defendants' violations of their applicable duty of care would lead to an incident like the Attack by arming one or more dangerous individuals like the Shooter with a lethal tool especially well-suited to misuse in mass shootings.

140.    This was because of, among other things, a lengthy history of mass shootings involving HCMs – often smaller HCMs than a monstrous 60-round

magazine—leading up to 2021.

141.    This foreseeable harm is precisely what materialized.

142.    April 15, 2021, shortly after 11:00 p.m., the FedEx facility was filled with people. It was payday and many employees were picking up their paychecks. It was also shift change time and employees were, therefore, both arriving and departing the facility. The Shooter entered the FedEx facility, cloaked in a tactical vest and wielding two AR-style rifles with HCMs attached. After shooting and killing two employees in the locker room, the Shooter opened fire on a group of employees who were waiting to pick up their paychecks.

143.    As a result of the massive capacity of the Magazine and the corresponding lack of a need to pause and reload, the Shooter was able to discharge 60 rounds in a matter of seconds.

144.    This uninterrupted torrent of fire enabled by the Magazine did not provide the Shooter's victims with any meaningful chance to escape or fight back

145.    The Defendants' unlawful and reckless conduct in manufacturing, distributing, marketing, or selling the unreasonably dangerous Magazine directly and foreseeably led to 13 people being shot with bullets expended from the Magazine during the Attack (including 8 who suffered fatal wounds).

146.    Plaintiffs are, thus, entitled to civil justice against the Defendants in terms of redress for the damages directly and proximately flowing from the Defendants' negligent business practices in manufacturing, distributing, marketing, or selling the Magazine.

147.    Upon information and belief, the Defendants have also not changed their negligent practices in any manner since the Attack, other than being forced to take down one of its advertising videos because it violated YouTube Community Guidelines. The other video advertisement remains on Defendant American Tactical's YouTube page.

148.   As a result, Plaintiffs are entitled to injunctive relief to abate the ongoing nuisance created by Defendants' misconduct with regard to 60-round HCMs.

### FIRST CAUSE OF ACTION
**(Negligence—All Defendants)**

Gurinder Singh Bains, as Personal Representative of the Estate of Jaswinder Singh (deceased):

149.   Plaintiff incorporates by reference all preceding paragraphs in this Complaint as if restated fully here.

150.   Plaintiff Gurinder Singh Bains brings this claim as Personal Representative of the Estate of Jaswinder Singh, deceased, pursuant to N.Y. Est. Powers & Trusts Law § 11-3.1.

151.   All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

152.   All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

153.   Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

154.   Instead, upon information and belief, Defendants' negligent conduct channeled the Magazine into the hands of the Shooter.

155.   It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

156.    This is precisely what occurred in this case.

157.    Defendants' negligence is an actual and proximate or legal cause of Jaswinder Singh's injuries.

158.    As a result, Jaswinder Singh experienced physical injury resulting in great pain and suffering, both physical and mental.  The Estate of Jaswinder Singh also sustained funeral expenses. Gurinder Singh Baines, as Personal Representative of the Estate of Jaswinder Singh, and pursuant to N.Y. Est. Powers & Trusts Law § 11-3.3, now seeks to recover these damages in an amount in excess of $75,000.

159.    Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jaswinder Singh.

160.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

161.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

162.    As Personal Representative of Jaswinder Singh's Estate, Gurinder Singh Bains seeks punitive damages pursuant to N.Y. Est. Powers & Trusts § 5-4.3 in an amount appropriate to punish Defendants and to deter similar conduct in the future.

163.    The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## SECOND CAUSE OF ACTION
### (Wrongful Death—All Defendants)

Gurinder Singh Bains, as Personal Representative of the Estate of Jaswinder Singh (deceased):

164.   Plaintiff incorporates by reference paragraphs 1 through 145 in this complaint as if restated fully herein.

165.   Plaintiff Gurinder Singh Bains, as the Personal Representative of Jaswinder Singh's Estate brings this cause of action pursuant to N.Y. Est. Powers & Trusts Law § 5-4.1 and alleges that Defendants' negligence is a legal and/or proximate cause of Jaswinder Singh's death.

166.   All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

167.   All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

168.   Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

169.   Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

170.   It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

171.   This is precisely what occurred in this case.

172.   Thus, Defendants' negligent and unlawful conduct directly and

36

proximately caused Plaintiff's harm.

173.   Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Jaswinder Singh's injuries and death.  Plaintiff on behalf of the distributes of the Estate of Jaswinder Singh has sustained damages consisting of the loss of pecuniary support in an amount exceeding $75,000.  Plaintiff on behalf of Jaswinder Singh's distributees, and each of them, seek these damages together with interest pursuant to N.Y. Est. Powers & Trusts Law § 5-4.3.

174.   Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jaswinder Singh.

175.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

176.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

177.   As Personal Representative of Jaswinder Singh's Estate, Gurinder Singh Bains seeks punitive damages pursuant to N.Y. Est. Powers & Trusts § 5-4.3 in an amount appropriate to punish Defendants and to deter similar conduct in the future.

178.   The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## THIRD CAUSE OF ACTION
### (Public Nuisance—All Defendants)

Gurinder Singh Bains, as Personal Representative of the Estate of Jaswinder

37

Singh (deceased):

179.    Plaintiff incorporates by reference paragraphs 1 through 145 in this complaint as if restated fully herein.

180.    Plaintiff Gurinder Singh Bains brings this claim as Personal Representative of the Estate of Jaswinder Singh pursuant to N.Y. Est. Powers & Trusts Law § 11-3.1.

181.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

182.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

183.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

184.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

185.    As a result of the Attack, Jaswinder Singh suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

186.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

187.    As a proximate or legal result of Defendants' nuisance and/or wrongful

acts, Jaswinder Singh endured pain, suffering, and/or disfigurement. Plaintiff Gurinder Singh Bains as Personal Representative of the Estate of Jaswinder Singh, seeks damages for Jaswinder Singh's pain, suffering, and disfigurement pursuant to N.Y. Est. Powers & Trusts Law § 11-3.3 in an amount in excess of $75,000.

188.   As a further actual and proximate or legal result of Defendants' nuisance and/or wrongful acts, Jaswinder Singh's Estate incurred special damages, to include funeral and cremation expenses.  As Personal Representative of Jaswinder Singh's Estate, Plaintiff Gurinder Singh Bains seeks these special damages pursuant to N.Y. Est. Powers & Trusts Law § 11-3.1.

189.   Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jaswinder Singh.

190.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

191.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

192.   As Personal Representative of Jaswinder Singh's Estate, Gurinder Singh Bains seeks punitive damages pursuant to N.Y. Est. Powers & Trusts § 5-4.3 in an amount appropriate to punish Defendants and to deter similar conduct in the future.

193.   The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

194.   Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

195.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

### FOURTH CAUSE OF ACTION
### (Wrongful Death in re: Public Nuisance—All Defendants)

Gurinder Singh Bains, as Personal Representative of the Estate of Jaswinder Sing (deceased):

196.    Plaintiff incorporates by reference paragraphs 1 through 145 in this complaint as if restated fully herein.

197.    Plaintiff Gurinder Singh Bains is the Personal Representative of the Estate of Jaswinder Singh, deceased.

198.    Plaintiff Gurinder Singh Bains brings this cause of action pursuant to N.Y. Est. Powers & Trusts Law § 5-4.1.

199.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

200.    A public nuisance under Indiana and New York law exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

201.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

202.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside of Indiana and New York which increased both the risk and lethality of

40

mass shootings like the Attack.

203.   As a result of the Attack, Jaswinder Singh suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

204.   Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

205.   Defendants' negligence and/or wrongful acts was the actual and proximate or legal cause of Jaswinder Singh's injuries and death.  Plaintiff, on behalf of the distributes of the Estate of Jaswinder Singh, has sustained damages consisting of the loss of pecuniary support in an amount exceeding $75,000.  Plaintiff on behalf of Jaswinder Singh's distributees, and each of them, seek these damages, together with interest, pursuant to N.Y. Est. Powers & Trusts Law § 5-4.3.

206.   Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Jaswinder Singh.

207.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs  and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

208.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

209.   As Personal Representative of Jaswinder Singh's Estate, Gurinder Singh Bains seeks punitive damages pursuant to N.Y. Est. Powers & Trusts § 5-4.3 in an amount appropriate to punish Defendants and to deter similar conduct in the future.

210.   The actions of Defendants have forced Plaintiff to retain counsel to represent him in the prosecution of this action, and he is therefore entitled to an award

of a reasonable amount as attorney's fees and costs of suit.

211.    Upon information and belief, Defendants have not reformed their reckless practices in any way since the Attack.

212.    As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

## FIFTH CAUSE OF ACTION
### (Negligence—All Defendants)

Harpreet Singh and his wife, Dilpreet Kaur:

213.    Plaintiffs incorporate by reference paragraphs 1 through 145 as if restated fully here.

214.    All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

215.    All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

216.    Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had access to the Magazine.

217.    Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

218.    It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

219.    This is precisely what occurred in this case.

220.   Defendants' negligence is an actual and proximate or legal cause of Harpreet Singh's injuries.

221.   As a result, Harpreet Singh suffered bodily injury and resulting pain and suffering, disability, disfigurement, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.  The losses suffered are either permanent or continuing and Harpreet Singh will suffer the losses in the future.

222.   Harpreet Singh now seeks to recover damages in an amount in excess of $75,000.

223.   As a result of the aforementioned negligence of Defendants, Dilpreet Kaur was caused to suffer and will continue to suffer in the future, significant expenses due to her husband's disability as well as a loss of consortium and loss of assistance, all to the detriment of her marital relationship to Plaintiff Harpreet Singh.

224.   Dilpreet Kaur now seeks to recover damages in an amount in excess of $75,000.

225.   Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public including Harpreet Singh.

226.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs  and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

227.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

228.   Harpreet Singh and Dilpreet Kaur seek punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

229.   The actions of Defendants have forced Plaintiffs to retain counsel to

represent them in the prosecution of this action, and they are therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## SIXTH CAUSE OF ACTION
### (Public Nuisance—All Defendants)

Harpreet Singh and his wife Dilpreet Kaur:

230.    Plaintiffs incorporate by reference paragraphs 1 through 145 in this complaint as if restated fully here.

231.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

232.    A public nuisance exists under Indiana and New York law for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

233.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

234.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside the States of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

235.    As a result of the Attack, Harpreet Singh suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

236.   Plaintiffs are entitled to recover damages in a claim sounding in public nuisance.

237.   As proximate or legal result of Defendants' nuisance and/or wrongful acts, Harpreet Singh has endured and will continue to endure pain, suffering, and/or disfigurement. Plaintiff Harpreet Singh seeks damages in an amount in excess of [$75,000].

238.   As a result of the aforementioned nuisance and/or wrongful acts of Defendants, Dilpreet Kaur was caused to suffer and will continue to suffer in the future, significant expenses due to her husband's disability as well as a loss of consortium and loss of assistance, all to the detriment of her marital relationship to Plaintiff Harpreet Singh.

239.   Dilpreet Kaur now seeks to recover damages in an amount in excess of $75,000.

240.   Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Harpreet Singh.

241.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs  and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

242.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

243.   Harpreet Singh seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

244.   The actions of Defendants have forced Plaintiffs to retain counsel to represent them in the prosecution of this action, and they are therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

245.   Upon information and belief, Defendants have also not reformed their reckless practices in any way since the Attack.

246.   As a result, Plaintiffs are also entitled to injunctive relief so as to abate an ongoing public nuisance.

## SEVENTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress—All Defendants)

Harpreet Singh and his wife Dilpreet Kaur:

247.   Plaintiffs incorporate by reference paragraphs 1 through 145 as if restated fully here.

248.   All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

249.   All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

250.   Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had access to the Magazine.

251.   Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

252.   It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

253.   This is precisely what occurred in this case.

254.   Defendants' negligence is an actual and proximate or legal cause of

Harpreet Singh's injuries.

255.    As a result, Harpreet Singh experienced physical injury and mental or emotional anguish.

256.    Harpreet Singh now seeks to recover damages in an amount in excess of $75,000.

257.    As a result of the aforementioned negligence by Defendants, Dilpreet Kaur was caused to suffer and will continue to suffer in the future, significant expenses due to her husband's disability as well as a loss of consortium and loss of assistance, all to the detriment of her marital relationship to Plaintiff Harpreet Singh.

258.    Dilpreet Kaur now seeks to recover damages in an amount in excess of $75,000.

259.    Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Harpreet Singh.

260.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

261.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

262.    Harpreet Singh and Dilpreet Kaur seek punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

263.    The actions of Defendants have forced Plaintiffs to retain counsel to represent them in the prosecution of this action, and they are therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## EIGHTH CAUSE OF ACTION
### (Negligence—All Defendants)

Lakhwinder Kaur:

264.   Plaintiff incorporates by reference paragraphs 1 through 145 in this Complaint as if restated fully here.

265.   All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

266.   All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

267.   Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had legal access to the Magazine.

268.   Instead, upon information and belief, Defendants' negligent conduct directly channeled the Magazine into the hands of the Shooter.

269.   It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

270.   This is precisely what occurred in this case.

271.   Defendants' negligence is an actual and proximate or legal cause of Lakhwinder Kaur's injuries.

272.   As a result, Lakhwinder Kaur suffered bodily injury and resulting pain and suffering, disability, disfigurement, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of ability to earn money.  The losses suffered are either permanent or

continuing and Lakhwinder Kaur will suffer the losses in the future.

273.    Lakhwinder Kaur now seeks to recover damages in an amount in excess of $75,000.

274.    Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Lakhwinder Kaur.

275.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs  and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

276.    Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

277.    Lakhwinder Kaur seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

278.    The actions of Defendants have forced Plaintiff to retain counsel to represent her in the prosecution of this action, and Plaintiff is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## NINTH CAUSE OF ACTION
### (Public Nuisance—All Defendants)

Lakhwinder Kaur:

279.    Plaintiff incorporates by reference paragraphs 1 through 145 in this complaint as if restated fully here.

280.    All Defendants were, at all times, subject to a general duty to refrain from unreasonable, unlawful, and/or unsafe business practices that create a public nuisance.

281.    A public nuisance exists under Indiana and New York law for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

282.    A public nuisance is actionable by a private person where that person has suffered special injury beyond that suffered by the community at large.

283.    All Defendants, by failing to act in accordance with their applicable duty of care, substantially interfered with the health and safety of individuals both inside and outside the States of Indiana and New York which increased both the risk and lethality of mass shootings like the Attack.

284.    As a result of the Attack, Lakhwinder Kaur suffered a particular harm that is unique from the harm other members of the community at large have experienced as a result of this nuisance.

285.    Plaintiff is entitled to recover damages in a claim sounding in public nuisance.

286.    As proximate or legal result of Defendants' nuisance and/or wrongful acts, Lakhwinder Kaur has endured and will continue to endure pain, suffering, and/or disfigurement. Plaintiff Lakhwinder Kaur seeks damages in an amount in excess of $75,000.

287.    Defendants conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Lakhwinder Kaur.

288.    Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs  and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

289.    Defendants are vicariously liable for punitive damages arising from the

outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

290.   Lakhwinder Kaur seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

291.   The actions of Defendants have forced Plaintiff to retain counsel to represent her in the prosecution of this action, and Plaintiff is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

292.   Upon information and belief, Defendants have also not reformed their reckless practices in any way since the Attack.

293.   As a result, Plaintiff is also entitled to injunctive relief so as to abate an ongoing public nuisance.

## TENTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress—All Defendants)

Lakhwinder Kaur:

294.   Plaintiff incorporates by reference paragraphs 1 through 145 in this Complaint as if restated fully here.

295.   All Defendants voluntarily assumed a multifaceted duty of care to only manufacture, distribute, market, and/or sell firearms accessories, including HCMs, in the safest possible manner so as to minimize the risk of misuse of their products in incidents like the Attack.

296.   All Defendants violated one or more aspects of this duty by placing an unreasonably dangerous product on the market without sufficient safeguards to prevent its foreseeable unlawful use.

297.   Upon information and belief, had the Defendants complied with their applicable duty of care, the Shooter would not have had access to the Magazine.

298.   Instead, upon information and belief, Defendants' negligent conduct

directly channeled the Magazine into the hands of the Shooter.

299.   It was eminently foreseeable to all Defendants, well before the Attack, that provision of an unreasonably dangerous HCM like the Magazine to the general public without appropriate safeguards would likely result in such products being misused in incidents like the Attack.

300.   This is precisely what occurred in this case.

301.   Defendants' negligence is an actual and proximate or legal cause of Lakhwinder Kaur's injuries.

302.   As a result, Lakwinder Kaur experienced and continues to experience physical injury, mental and emotional anguish.

303.   Lakhwinder Kaur now seeks to recover damages in an amount in excess of $75,000.

304.   Defendants' conduct was carried out with reckless, willful, and conscious disregard for the safety of the public, including Lakhwinder Kaur.

305.   Defendants' conduct including, but not limited to, its failure to implement safeguards in the sale and distribution of HCMs  and its intentional marketing of HCMs in a fashion reasonably likely to appeal to dangerous classes of people like the Shooter, warrants an award of punitive damages.

306.   Defendants are vicariously liable for punitive damages arising from the outrageous and unconscionable conduct of its employees, agents, and/or servants, as set forth herein.

307.   Lakhwinder Kaur seeks punitive damages in an amount appropriate to punish Defendants and to deter similar conduct in the future.

308.   The actions of Defendants have forced Plaintiff to retain counsel to represent Plaintiff in the prosecution of this action, and Plaintiff is therefore entitled to an award of a reasonable amount as attorney's fees and costs of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, expressly reserve their right to amend this Complaint before or at the time of trial to insert those items of damage not yet fully ascertainable, demand judgment against all Defendants, and each of them, as follows:

1. For general damages in an amount exceeding $75,000;

2. For special damages in an amount exceeding $75,000;

3. For punitive damages;

4. For loss of earnings;

5. For loss of consortium;

6. For interest as provided by law;

7. For all statutorily allowed damages;

8. For applicable restitution;

9. For an injunction requiring all Defendants to abate and/or cease contributing to the public nuisance they are creating in violation of one or more relevant statutes by unreasonably supplying 60-round HCM's like the Magazine to the public without public safeguards to prevent their nuisance;

10. For reasonable attorney fees and costs of suit incurred;

11. For trial by jury; and

12. For such other and further relief as this Court deems proper.

Respectfully submitted this the 13th day of April, 2023.

*/s/ Hadley E. Lundback*
Hadley E. Lundback, Esq.
WDNY Bar No. 437785
Kathryn Lee Bruns, Esq.
WDNY Bar No. 2874063
Faraci Lange
1882 South Winton Rd., Ste. 1
Rochester, NY 14618
hadley@faraci.com
kbruns@faraci.com

Leslie Mitchell Kroeger, Esq.
(*pro hac vice application forthcoming*)
Poorad Razavi, Esq.
(*pro hac vice application forthcoming*)
Rachael Flanagan, Esq.
(*pro hac vice application forthcoming*)
COHEN MILSTEIN SELLERS & TOLL
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
lkroeger@cohenmilstein.com
prazavi@cohenmilstein.com
rflanagan@cohenmilstein.com

Michael B. Eisenkraft, Esq.
(*WDNY Bar No. pending*)
COHEN MILSTEIN SELLERS & TOLL
88 Pine Street, 14th Floor
New York, NY 10005
meisenkraft@cohenmilstein.com

Jay Chaudhuri, Esq.
(*pro hac vice application forthcoming*)
COHEN MILSTEIN SELLERS & TOLL
407 North Person Street
Raleigh, NC 27601
jchaudhuri@cohenmilstein.com

Douglas N. Letter, Esq.
(*pro hac vice application forthcoming*)
Philip H. Bangle, Esq.
(*pro hac vice application forthcoming*)
BRADY
840 First Street NE, Ste. 400
Washington, DC 20002
dletter@bradyunited.org
pbangle@bradyunited.org

*Counsel for Plaintiffs*