UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

GURINDER SINGH BAINS, as Personal
Representative of the ESTATE OF JASWINDER
SINGH, deceased, HARPREET SINGH and his wife
DILPREET KAUR, and LAKHWINDER KAUR,

       Plaintiffs,

                                  CASE NO: 2:24-cv-03970-BHH

v.

AMERICAN TACTICAL, INC., ANTHONY
DICHARIO, JOSEPH CALABRO, SCHMEISSER
GMBH, and 365 PLUS D.O.O.,

       Defendants.
_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
AMERICAN TACTICAL, INC., ANTHONY DICHARIO, AND JOSEPH CALABRO'S
<u>MOTION TO DISMISS</u>**

INTRODUCTION ................................................................................................................... 1

STANDARD OF REVIEW. ...................................................................................................... 3

ARGUMENT ............................................................................................................................. 3

I.     Plaintiffs—Harmed By Defendants' Conduct—Have Article III Standing. ........................... 3

II.    The Protection of Lawful Commerce in Arms Act is Not Applicable and Does Not Bar
       Plaintiffs' Claims. ................................................................................................................. 3

       A.     Even if a Magazine Were a "Qualified Product," the Lawful Commerce Act Still
              Does Not Give Defendants Immunity for Their Unlawful Conduct. ........................ 12

       B      Plaintiffs Do Not Need Standing to Sue Under a Predicate Statute in order to Validly
              Allege a Violation of a Statute for Purposes of the Lawful Commerce Act ............. 17

       C.     Defendants' Violation of the Predicate Statutes Was the Proximate Cause of
              Plaintiffs' Harm ........................................................................................................... 18

III.   Indiana's Firearms Immunity Statute Does Not Apply to Plaintiffs' Claims ......................... 22

IV.    Defendant Calabro is Subject to Specific Personal Jurisdiction in South Carolina ............. 24

       A.     As the marketing director of a Summerville-based company, Calabro purposefully
              availed himself to the privileges of conducting activities in South Carolina. ........... 24

       B.     Plaintiffs' claims arise out of and relate to ATI's advertisements, which are
              promulgated—with Calabro's direct involvement—out of ATI's South Carolina
              headquarters .................................................................................................................. 27

       C.     Exercising personal jurisdiction over Calabro in South Carolina is reasonable. ...... 29

       D.     Subjecting Calabro to personal jurisdiction in South Carolina is fully consistent with
              due process. .................................................................................................................. 30

       E.     At minimum, this Court should permit jurisdictional discovery on the extent of
              Calabro's contacts with South Carolina. ..................................................................... 31

       CONCLUSION ...................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In Re Academy*
    625 S.W.3d 19 (Tex. 2021) ....................................................................................9, 10

*Apolinar v. Polymer80, Inc.*,
    2022 Cal. Super. LEXIS 2591 (Cal. Sup. Ct. Feb. 2, 2022) ......................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ....................................................................................................18

*Bannerman v. Mt. State Pawn. Inc.*,
    2010 U.S. Dist. LEXIS 145292 (N.D.W.Va. Nov. 5, 2010) ......................................18

*Batts v. SNAP Inc.*,
    2024 WL 3677802 (D.S.C. Aug. 6, 2024) .................................................................32

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Co.*,
    582 U.S. 255 (2017) ..............................................................................................30, 31

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
    143 F.R.D. 628 (D.S.C. 1992) ...................................................................................31

*CFA Inst. v. Inst. of Chartered Fin. Analysts of India*,
    551 F.3d 285 ...............................................................................................................29

*Christian Sci. Bd. of Dir. of First Church of Christ, Scientist v. Nolan*,
    259 F.3d 209 (4th Cir. 2001) ...............................................................................29, 30

*City of Gary v. Smith & Wesson Corp. et al.*,
    801 N.E. 2d 1222 (Indiana 2003) (*Gary I*) ..............................................................16

*City of New York v. Beretta U.S.A. Corp.*,
    524 F.3d 384 (2d Cir. 2008) ................................................................................13, 14

*Cockrell v. Hillerich & Bradsby Co.*,
    363 S.C. 485 (2005) ...................................................................................................24

*Cooke v. Allstate Management Corp.*,
    741 F. Supp. 1205 (D.S.C. 1990) ..............................................................................19

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ...................................................................................................28

ii

*Doe 9 v. Varsity Brands, LLC*,
    679 F. Supp. 3d 464 (D.S.C. 2023)................................................................24, 27, 29

*ESAB Grp., Inc. v. Zurich Ins. PLC*,
    685 F.3d 376 (4th Cir. 2012) ......................................................................24, 29

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021)............................................................................................28

*Gibbs v. Plain Green, LLC*,
    331 F. Supp. 3d 518 (E.D. Va. 2018) ................................................................32

*Goldstein v. Smith & Wesson Corp.*,
    Case No. 37-2020-16638-CU-PO-CTL (Calif. Super. Ct. May 26, 2020)..............15

*Grayson v. Anderson*,
    816 F.3d 262 (4th Cir. 2016) ............................................................................32

*Green v. Kyung Chang Indus. USA Inc.*,
    2022 WL 987555 (Nev. Dist. Ct. Mar. 23, 2022)..............................................7, 10

*Hanson v. Denckla*,
    357 U.S. 235 ......................................................................................................26

*Hawkins v. i-TV Digitalis Tavkozlesi zrt.*,
    935 F.3d 211 (4th Cir. 2019) ............................................................................24

*Ileto v. Glock, Inc.*,
    565 F.3d 1126 (9th Cir. 2009) ..........................................................................14

*Informaxion Sols., Inc. v. Vantus Grp.*,
    130 F. Supp. 3d 994 (D.S.C. 2015)....................................................................32

*Jones v. Mean, LLC*,
    No. 810316/2023, slip op. (N.Y. Sup. Ct. Feb. 22, 2024) ........................................6

*Lowy v. Daniel Defense, LLC, et al.*,
    2024 WL 3521508 (E.D. Va. July 24, 2024) ..................................................1, 9

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020)..............................................................................3, 15

*M3 USA Corp. v. Hart*,
    516 F. Supp. 3d 476 (E.D. Pa. 2021) ................................................................26

*Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*,
    2017 WL 4340123 (N.D. Ill. Sept. 29, 2017) ....................................................26

*Perdue Foods LLC v. BRF S.A.*,
    814 F.3d 185 (4th Cir. 2016) ...................................................................25, 26

*Prescott v. Slide Fire Solutions, LP*,
    341 F. Supp. 3d 1175 (D. Nev. 2018) ..............................................................6

*Smith & Wesson Corp. v. City of Gary*,
    875 N.E.2d 422 (Ind. Ct. App. 2007)(*Gary II*) .....................................16, 17

*Smith v. Teledyne Cont'l Motors, Inc.*,
    840 F. Supp. 2d 927 (D.S.C. 2012).................................................................30

*Soto v. Bushmaster Firearms Int'l, LLC*,
    331 Conn. 53 (Conn. 2019).............................................................13, 15, 21

*Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*,
    682 F.3d 292 (4th Cir. 2012) ..........................................................................29

*Travel Leaders Leisure Grp., LLC v. Cruise & Travel Experts, Inc.*,
    2020 WL 4604534 (D. Minn. Aug. 11, 2020) ................................................26

*UMG Recordings, Inc. v. Kurbanov*,
    963 F.3d 344 (4th Cir. 2020) ...................................................................24, 25

*United States v. Lanning*,
    723 F.3d 476 (4th Cir. 2013) ............................................................................4

*Walden v. Fiore*,
    571 U.S. 277 (2014).................................................................................25, 26

**Statutes**

520 ILCS 5/1.2bb...................................................................................................8

520 ILCS 5/2.25.....................................................................................................8

15 U.S.C. § 7903(4) ..............................................................................................4

15 U.S.C. § 7903(5)(A).........................................................................................12

18 U.S.C. § 921(a)(3)..........................................................................................5, 7

California Unfair Competition Law .....................................................................15

Connecticut's Unfair Trade Practices Act (CUTPA)..........................................15

Gun Control Act...................................................................................................18

Ind. Code § 34-12-3-3......................................................................................22, 23

Lawful Commerce in Arms Act, 15 U.S.C. 7903 et seq. .......................................................... *passim*

Nevada Deceptive Trade Practices Act ..................................................................................16

New York Penal Law § 240.45 ..............................................................................................13

South Carolina Unfair Trade Practices Act ...........................................................................13

**Other Authorities**

*Component*, Am. Heritage Dictionary,
  https://www.ahdictionary.com/word/search.html?q=component (last visited
  Oct. 9, 2024) ....................................................................................................................4

*Component*, Merriam-Webster, https://www.merriam-
  webster.com/dictionary/component (last visited Oct. 9, 2024) ......................................4

*Constituent*, Merriam-Webster, https://www.merriam-
  webster.com/dictionary/constituent (last visited Oct. 9, 2024) ......................................4

*Element*, Am. Heritage Dictionary,
  https://www.ahdictionary.com/word/search.html?q=element (last visited Oct.
  9, 2024) ............................................................................................................................5

Rule 12(b)(6) ...............................................................................................................2, 3

## INTRODUCTION

Defendants American Tactical, Inc. (ATI), its president Anthony DiChario, and its marketing director Joseph Calabro import, market, distribute, and sell high-capacity rifle magazines (HCMs) to civilians in America. High-capacity magazines have a single purpose: to kill as many people as possible in a short amount of time, without the need to pause to reload. As Plaintiffs allege, Defendants market and sell high-capacity magazines to civilians without ensuring any restrictions or safeguards to keep such highly lethal products from ending up in dangerous hands. Instead, Defendants market their high-capacity magazines in ways that attract mass shooters, and Defendants make it easy for them to acquire this deadly accessory.

It is thus no surprise—indeed entirely foreseeable—that Defendants marketed and sold or distributed one of their high-capacity magazines to a mass shooter, who then used it to carry out a shooting rampage at the workplace of the Plaintiffs and their families, injuring some and killing others. Indeed, as the Second Amended Complaint (SAC) alleges, Defendants' marketing and distribution of their high-capacity magazines armed the young mass shooter with the critical tools he needed to carry out his massacre—not simply the high-capacity magazine itself, but also the confidence that he would be successful in firing a barrage of bullets in a short amount of time, emboldening him with the belief that he could accomplish his mission of killing as many people as possible before having to end his massacre.

Defendants now seek to avoid responsibility, moving to dismiss Plaintiffs' claims.

Defendants' motion to dismiss relies heavily on a recent decision from the U.S. District Court for the Eastern District of Virginia, dismissing negligent marketing claims against various manufacturers of firearms, firearms parts, and firearms accessories. *See Lowy v. Daniel Def., LLC, et al.,* 2024 WL 3521508 (E.D. Va. July 24, 2024), *appeal pending*, No. 24-1822 (4th Cir.).

Although the legal theory in this case is similar to the one advanced by the Plaintiffs in *Lowy*, the parties, the underlying facts, and the allegations in this case are very different. Moreover, the district court decision in *Lowy* is premised on application of a draconian pleading standard that is entirely inconsistent with Fourth Circuit precedent and has never before been used by a court in firearms litigation.[1]

In any event, because this case is so different from *Lowy*, this Court can and should deny Defendants' motion to dismiss despite the pending appeal in *Lowy*. This case should proceed even if the standards established in *Lowy* were to survive appeal. ***First***, in this case, although Defendants sell firearms, as well as firearm magazines, only their conduct in marketing, selling, and distributing magazines is at issue. Because magazines are not "component parts" of firearms, none of the statutory immunities, such as the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §7903 et seq., apply here to shield Defendants from liability. ***Second***, much of Defendants' arguments (pertaining to Article III standing, Rule 12(b)(6), and the Lawful Commerce Act) rely on either ignoring, or arguing the weight of, the Plaintiffs' allegations supporting causation. At this stage, reasonable inferences from the allegations must be made in the Plaintiffs' favor.

Finally, Defendant Calabro's challenge to personal jurisdiction is wrong. Calabro purposefully availed himself to the Court's jurisdiction by accepting employment with a South Carolina-based company. His actions at issue in this case arose directly from that employment. Given his purposeful ties to South Carolina, exercise of personal jurisdiction over Calabro in connection with actions taken as part of his employment with a South Carolina-based company is constitutionally reasonable and uncontroversial.

---

[1] For this Court's convenience, we have attached as Exhibits 1 and 2, the Fourth Circuit opening brief in *Lowy* filed by the appellants and the amicus brief filed by Brady United, *et al.* Those briefs fully explain how the *Lowy* district court plainly erred in applying the wrong pleading standard.

2

## STANDARD OF REVIEW

"[I]n deciding a Rule 12(b)(6) motion to dismiss a complaint, [a court] is required to accept all well-pleaded factual allegations in the complaint as true" and "must also construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (internal quotation omitted). "[T]he court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch*, 952 F.3d at 75.

## ARGUMENT

### I.     Plaintiffs—Harmed By Defendants' Conduct—Have Article III Standing.

As noted, the draconian standard utilized by the trial court in *Lowy* is an outlier and inconsistent with generally accepted federal pleading rules. Nonetheless, Defendants' argument, based on that decision, is that Plaintiffs' Second Amended Complaint does not adequately allege that Defendants' conduct caused Plaintiffs' harm. *See* Defs.' Br. at 5-8. That claim is mistaken because this case involves very different alleged conduct by different defendants than in *Lowy*.

Defendants have based three separate arguments on asserted lack of causation: (1) supposed lack of Article III standing; (2) claimed federal statutory immunity; and (3) asserted Rule 12(b)(6) grounds concerning the elements of negligence. Because Plaintiffs' Second Amended Complaint satisfies the causation requirement for all three of Defendants' grounds, we address causation comprehensively, see *infra*, Section D.

### II.     The Protection of Lawful Commerce in Arms Act is Not Applicable and Does Not Bar Plaintiffs' Claims.

The Lawful Commerce Act is a limited affirmative defense that may be asserted by manufacturers or sellers of certain "qualified products." The plain text of the Lawful Commerce Act does not, however, impose any immunity for the sale or manufacture of rifle magazines,

because those items are not "qualified products" under the Lawful Commerce Act. That law applies only to manufacturers or sellers of "qualified products," which are further defined as "firearm[s]," "ammunition," or "component part[s]" of firearms or ammunition. 15 U.S.C. § 7903(4) and (5)(A). High-capacity magazines do not fit any of those terms.

### A. The Magazine is Not a Qualified Product, and the Lawful Commerce Act Thus Does Not Apply in this Case.

A magazine is indisputably neither a firearm nor ammunition. Thus, Defendants can only invoke the Lawful Commerce Act's limited affirmative defense if a magazine is a "component part" of a firearm. However, as Defendants' own marketing demonstrates (*see* SAC ¶ 65), a magazine is merely a firearm accessory. Because a magazine is not a component part integral to a firearm's ability to discharge a bullet, the Lawful Commerce Act does not shield Defendants from liability that would otherwise be applied under well accepted South Carolina tort and consumer protection law.

### 1. A "Component Part" Must Be "Essential" and "Integral" to the Operation of the Rifle.

The Lawful Commerce Act does not define the term "component part," so this Court should look to standard dictionary definitions to determine its meaning. *See, e.g.*, *United States v. Lanning,* 723 F.3d 476, 481 (4th Cir. 2013). The ordinary meaning of "component part" is "constituent," which is defined as "an essential part." *See Component*, Merriam-Webster, https://www.merriam-webster.com/dictionary/component (last visited Oct. 9, 2024); *Constituent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/constituent (last visited Oct. 9, 2024). The word "component" can also refer to an "element," which is "[a] fundamental, essential, or irreducible constituent of a composite entity." *See Component*, Am. Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=component (last visited Oct. 9, 2024);

*Element*, Am. Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=element (last visited Oct. 9, 2024). The plain meaning of "component part of a firearm," then, is a part of the firearm that is "essential."

The Lawful Commerce Act's statutory structure confirms this understanding. Although the statute leaves "component part" undefined, it *does* explicitly define "firearm," by cross-referencing another definition of that word, located elsewhere in the United States Code. *See* § 7903(4) (citing 18 U.S.C. § 921(a)(3)). The cross-referenced section defines "firearm" to include not just items that are commonly understood to be firearms, but also "any firearm muffler or firearm silencer," § 921(a)(3)(C). The Lawful Commerce Act, however, explicitly carves out that portion of the definition, excluding firearm mufflers and silencers from *its* definition of "firearm." *See* § 7903(4) (defining "qualified product" to include "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3))," but not including subparagraph (C)). Congress thus plainly intended that *inessential* products, like mufflers and silencers, would *not* be encompassed within the definition of "qualified product," and thus would not receive any of the newly created statutory limited immunity from long established tort law principles.

The few courts that have faced this issue have agreed with this understanding of the term "component part." For example, the U.S. District Court for the District of Nevada concluded that whether a rifle stock is a "component part" of a rifle for purposes of the unique immunity imposed on states by the Lawful Commerce Act depends on whether it is essential to the rifle:

> [T]he word "component" is defined as a "constituent part," and "constituent" means "an essential part," or "serving to form, compose, or make up a unit or whole." Merriam-Webster's Collegiate Dictionary 255, 267 (11th ed. 2003). "Part" means "one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and which together constitute the whole," or "an essential portion or integral element." *Id*. at 902-03.

*Prescott v. Slide Fire Sols., LP,* 341 F. Supp. 3d 1175, 1188 (D. Nev. 2018); *accord Jones v. Mean, LLC*, No. 810316/2023, slip op. at 3-4 (N.Y. Sup. Ct. Feb. 22, 2024). The *Prescott* court contrasted a "component part" with an "accessory," noting that the latter is "a thing of secondary or subordinate importance," or "an object or device that is not essential in itself but adding to the beauty, convenience, or effectiveness of something else." *Prescott*, 341 F. Supp. 3d at 1188. In *Prescott*, the product at issue was a type of aftermarket rifle stock; the court first determined that a rifle stock is "essential" and "integral" to the operation of the rifle. *Id.* at 1188. It next found, therefore, that any replacement stock is also a "component part." *Id.* at 1198.

Defendants rely heavily on *Prescott* to support their motion to dismiss, but their reliance is misplaced. To make the argument, Defendants need to equate rifle magazines with rifle stocks. But there is no logic or basis to make that equivalence. Unlike rifle stocks, a rifle magazine—original or aftermarket replacement—is not necessary to the function of a rifle. As alleged in the Second Amended Complaint, with supporting evidence, a magazine is not needed to load, fire, or discharge a bullet. *See* SAC ¶¶ 67-70. While a magazine may add to the convenience or effectiveness of a rifle, those attributes render it merely an accessory—not an essential component part.

Next, the District Court for Clark County, Nevada, adopted this meaning of "component part" from *Prescott*. *See Green v. Kyung Chang Indus. USA Inc.*, No. A-21-838762-C2022 WL 987555 at *1 (Nev. Dist. Ct. Mar. 23, 2022) (denying magazine manufacturer's motion to dismiss under the Lawful Commerce Act because magazines are not component parts of firearms), *mandamus denied, Kyung Chang Indus. USA Inc. v. Eighth Judicial Dist. Ct.*, 525 P.3d 836 (Nev. 2023), *cert. denied,* 144 S. Ct. 98, 2023 WL 6377954 (2023). Then, applying this meaning of "component part" to rifle magazines—just like the items at issue in this case—the *Green* court

determined that rifle magazines were not "component parts" of rifles and that the Lawful Commerce Act thus did not apply to shield the defendants from liability. *Id*. at *1.[2]

The only court to address this issue—whether a magazine is a "component part" for purposes of the Lawful Commerce Act—*Green*, decisively rejected Defendants' argument. *See id*. at *1. Like the Defendants here, defendant Kyung Chang relied on *Prescott* to support its argument that the magazine is not a component part. But, during oral argument, defendant Kyung Chang admitted that the subject firearm could in fact function without a magazine. *See Green* 1/18/2022 MTD Hr'g Tr. at 25:19-23, 6:21-25, 7:1-25, 8:1-3, attached as Ex. 3. As with the rifle in *Green*, the rifle here can and will function without a magazine.

In ruling that rifle magazines are not component parts of rifles for purposes of the Lawful Commerce Act, the *Green* court acknowledged and agreed with *Prescott*, noting that a rifle stock is essential to the operation of a rifle. *Id*. at 11:16-25, 17:3-5; *Green*, 2022 WL 987555 at *1.

### 2. The Second Amended Complaint Makes Clear that Rifle Magazines Are Not Essential or Integral to the Operation of a Rifle.

Here, we have the same issue as in *Green*. The Second Amended Complaint makes clear that a high-capacity magazine is not essential to the function of firing a shot. "A 60-round HCM like the Magazine is not a component part of a firearm. Indeed, a magazine is not a component part of a firearm." SAC ¶ 64. "A 60-round HCM is not essential to the discharge of a gun." SAC ¶ 66. "Indeed, a gun like the Firearm can and will fire with no magazine attached but a round in the chamber. In fact, a gun like the Firearm can be, and often is, manually loaded, one round at a time." SAC ¶ 67.

---

[2] The Lawful Commerce Act's definition of "firearm" hinges on the weapon's ability to fire a shot—"to expel a projectile," in the language of the statute, § 921(a)(3). *See* § 7903(4). Accordingly, for a component part to be "essential" to a "firearm" it must be essential to the function of firing a shot.

Those allegations are not simply theoretical. Indeed, there are at least three common situations in which a shooter will use the firearm without a magazine: (1) when hunting in states, such as Illinois, that require "single shot" rifles for specific game hunting; (2) when bench-rest shooting the rifle; and (3) if the magazine breaks, malfunctions, or is lost.

Starting with single-shot hunting, each state has its own hunting scheme that specifies what game can be hunted, when, and with what types of weapons. In Illinois, for example, deer hunters using rifles may only use "single shot . . . rifle[s]." 520 ILCS 5/2.25. And the hunting statute defines "single shot" rifle to be one that does not have a magazine in close proximity. 520 ILCS 5/1.2bb. Deer hunters in Illinois (as well as other similarly regulated hunters elsewhere) thus regularly load and use semi-automatic rifles without a magazine, thereby demonstrating that a magazine is not essential to the operation of the rifle. *See* SAC ¶¶ 68-69.

The second situation is one the *Green* court noted during oral argument of the motion to dismiss:

> I may be the type of person that wants to fire one single bullet, check how it fired. Go downrange, check it out, bring back. Fire one single bullet and do it on and on again and, for example, there, it allows me to use the gun exactly how the manufacturers set it to be used. I'm firing the gun. I don't need a magazine to do any of that.

*Green* 1/18/2022 MTD Hr'g Tr. at 10:22-11:3, attached as Ex. 3.

Finally, the third situation, a broken or lost magazine, is self-explanatory. If a rifleman breaks or loses his magazine, he can and will manually reload his rifle, one round at a time. *See* SAC ¶ 70 (summarizing trial testimony offered by a firearms manufacturer about why a safety device that would disable a gun from firing if its magazine were detached would impede survival if the magazine were lost or broken).

8

In sum, whether by choice or by necessity, an AR-15-style rifle is perfectly capable of functioning as a rifle without a magazine installed. Because a rifle magazine is not essential for the operation of a rifle, magazines are not "component parts" of rifles, and therefore they are not "qualified products" made exempt by Congress from the normal operation of state tort law. This Court is thus not impeded by any federal law from applying the state law that it normally would in a case like this.

As previously noted, Defendants rely heavily on *Lowy* (2024 WL 3521508 (E.D. Va. 2024)) for the proposition that magazines are "component parts" of rifles. S*ee* Defs.' Br. at 12. However, that issue—whether a magazine is a component part of a rifle—was not addressed by the *Lowy* decision. Rather, the *Lowy* court jumped straight to *Prescott*'s second step. This skipping ahead and failing to address the antecedent and fundamental issue is one of the critical flaws in the *Lowy* decision. *See Lowy* Appellants' Br. at 40-46, attached as Ex. 1. The *Lowy* court noted that the shooter in that case used aftermarket magazines to replace the magazines that were sold with the rifles he used in the shooting. And the *Lowy* court reasoned, following *Prescott*, that an aftermarket replacement part for a particular firearm part shares that part's underlying nature. That is, *if* a rifle magazine is a "component part" of a rifle, then a replacement magazine is as well. *See Lowy* at *3. But the court erroneously failed to determine whether a magazine is essential to the operation of a rifle in the first instance. As we have already demonstrated, it is not.

Defendants' motion also mentions *In Re Academy, Ltd.*, 625 S.W.3d 19 (Tex. 2021) to support its proposition that a magazine is a component part of a firearm. *See* Defs.' Br. at 10. However, unlike in *Green*, which fully analyzed the issue of whether a magazine was a component part for Lawful Commerce Act purposes, in *Academy*, the issue was not in dispute between the parties and so the issue was not addressed by the court. *See In Re Academy*, 625 S.W.3d at 19.

The claim of the plaintiffs in *Academy* was that the defendant dealer made an unlawful sale of a high-capacity magazine by selling it to an out-of-state customer who was from a state that had banned high-capacity magazines. *See id*. at 23. The plaintiffs' interest was for the magazine sale to be treated under the law as firearms sales are treated, because the firearms dealer in that case would have had to refuse the sale of the magazine to the out-of-state customer if magazines had the same legal sales requirements as firearms. *See id*. at 24. The issue of whether a magazine was essential to the operation of a rifle and thus a "component part" of a rifle for purposes of the Lawful Commerce Act was not before the court in *Academy*; the court's ruling there is accordingly of no value to the analysis here.

### 3.  Defendants Wrongly Complicate the Analysis by Relying on a Definition of "Semi-Automatic" Weapon, Which Is Not Actually Relevant Here.

Defendants also attempt to rely upon the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) definition of a semi-automatic weapon to support its argument that "[w]ithout a magazine, there is no 'next round' available to be chambered, and the 'semi-automatic' design feature of such a rifle will not function…" Defs.' Br. at 10. This argument belies the fact that what makes a weapon semi-automatic is a design feature and not an integral function that is affected by the use of the magazine.

This same argument, relying on the same authorities, was also made by defendant Kyung Chang in *Green* ("the intent of [a] semiautomatic firearm is only fulfilled when it has a number of…bullets inside of a magazine" (*Green* 1/18/2022 MTD Hr'g Tr. at 25:19-23, attached as Ex. 3) and rejected there by the Nevada court. 2022 WL 987555, at *1. The *Green* court correctly reasoned that "[a firearm] can discharge a bullet without a magazine in it. It's not an essential part where it prevents it from doing it, *i.e.*, if it didn't have a barrel in it, well, we would have a whole different question here." *Green* 1/18/2022 MTD Hr'g Tr. at 16:12-15, attached as Ex. 3. The *Green*

10

court further contrasted the differences between a magazine and the rifle stock at issue in *Prescott* by noting "shooting a rifle without a stock…I don't think…there's a manufacturer out there that would say, yes, that is a good idea, and the intent of the manufacturer was never to have a long rifle shot without a stock on it….You can't get an option to do that, and I think anybody who's ever fired a long rifle would know it would be stupid to fire a gun like that without a stock on it." *Id*. at 16:23-17:5.

Though Defendants rely heavily on *Prescott*, which we have discussed above; a proper reading of the *Prescott* decision shows it actually supports Plaintiffs' position. Here Defendants' argument—that a magazine is a component part because without it a design feature of a semi-automatic weapon will not function—weighs in favor of the assertion that a magazine is an accessory and not a component part. The court in *Prescott* noted that "[a]n accessory…is…an object or device that is not essential in itself but adding to the beauty, convenience, or effectiveness of something else." *Prescott*, 341 F. Supp. 3d at 1188. A magazine fits squarely within this definition. Defendants' argument that the "semi-automatic design feature" of a rifle will not function does not amount to a magazine becoming integral to the rifle's discharging of a bullet. The semi-automatic design feature, which is not itself essential, merely adds to the convenience or effectiveness of the rifle.

Finally, Defendants previously raised this same incorrect argument before Judge Wolford in the U.S. District Court for the Western District of New York. *See* 5/26/2024 MTD Hr'g Tr. at 22:4-23:10, attached as Ex. 4. Judge Wolford did not seem persuaded: "I don't think it has to be semi-automatic to be characterized as a 'rifle.' I mean in other words a semi-automatic rifle is still a firearm even if it doesn't operate as a semi-automatic rifle." *Id*. at 22:22-23:1.

11

**B. Even if a Magazine Were a "Qualified Product," the Lawful Commerce Act Still Does Not Give Defendants Immunity for Their Unlawful Conduct.**

For defendants to be shielded by the Lawful Commerce Act affirmative defenses, they must be engaged in *lawful* firearms commerce (as the very title of the statute demonstrates). When a defendant is engaged in *unlawful* sales or marketing of a firearm, the Lawful Commerce Act does not apply. This principle is known as the Predicate Exception to the statute, and it appears at 15 U.S.C. § 7903(5)(A)(i)-(vi). Congress provided an exception to the Lawful Commerce Act for suits against gun industry members that "knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm." 15 U.S.C. § 7903(5)(A)(iii). This case falls squarely within the Predicate Exception, and thus can proceed in this Court.

Here, Plaintiffs' case satisfies the Predicate Exception by credibly alleging that—if the Court finds magazines to be component parts—Defendants knowingly violated one or more laws applicable to the sale or marketing of firearms (or their component parts) and that the violation of these statutes proximately caused Plaintiffs' harm. Plaintiffs allege that: (1) Defendants knowingly violated South Carolina's prohibition on unfair or deceptive acts or practices while in the conduct of any trade or commerce, here, in its marketing and selling the Magazine (SAC ¶¶ 16-17, 148, 150); and (2) Defendants knowingly violated Indiana's prohibition on creation of a public nuisance by knowingly and unreasonably endangering the health and safety of numerous members of the public, including Plaintiffs, through its manufacturing, importing, marketing, distributing, and selling of products like the high-capacity magazine at issue here. *See, e.g.*, SAC ¶¶ 203-217.

Rather than focusing on the statutes raised by Plaintiffs (the South Carolina Unfair Trade Practices Act and Indiana's Public Nuisance law), Defendants argue generally that only statutes

that are specific to firearms can be used to satisfy the Predicate Exception. *See* Defs.' Br. at 15-17. But "[i]f Congress had intended to limit the scope of the predicate exception to violations of statutes that are *directly, expressly, or exclusively* applicable to firearms, however, it easily could have used such language, as it has on other occasions. The fact that the drafters opted instead to use only the term 'applicable,' which is susceptible to a broad reading, further supports the plaintiffs' interpretation…" *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 120 (Conn. 2019) (emphasis in original) (internal quotations omitted).

As the *Soto* court recognized, the very language of the Predicate Exception states that it is triggered when a State or Federal law "applicable to the…marketing of firearms" has been violated. This statutory text establishes that statutes like South Carolina's Unfair Trade Practices qualify as predicate statutes. Moreover, because "at the time [the Lawful Commerce Act] was enacted, no federal statutes directly or specifically regulated the marketing or advertising of firearms…[i]t would have made little sense for the drafters of the legislation to carve out an exception for violations of laws applicable to the marketing of firearms if no such laws existed." *Soto*, 331 Conn. at 121-22.

Despite the actual text of the Lawful Commerce Act, Defendants rely on two cases in support of their argument that predicate statutes must be tailored to firearms regulation. Both cases, as well as additional case law not addressed by Defendants, nevertheless support a determination that the statutes alleged to have been violated here do indeed satisfy the Predicate Exception.

Defendants first rely on *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), which determined that New York's criminal nuisance statute (New York Penal Law § 240.45) was one of general applicability "that d[id] not encompass the conduct of firearms manufacturers of which the City complain[ed]." 524 F.3d at 400. Second, Defendants rely on *Ileto*

13

*v. Glock, Inc.*, 565 F.3d 1126 (9th Cir. 2009), which found that the Lawful Commerce Act was intended to preempt state general tort theories of liability like those arising from the codified tort statutes alleged to have been violated. 565 F.3d at 1136. Notably, neither of these cases addressed a consumer protection statute like South Carolina's Consumer Protection Act, cited by Plaintiffs here.

With respect to *City of New York*, Defendants incorrectly attempt to broaden the scope of the Second Circuit's ruling by claiming that the court found "the predicate exception applies only to statutes specifically regulating the sale or marketing of firearms." *See* Defs.' Br. at 16. In reality, the court in *City of New York* explicitly stated "[w]e find nothing in the statute that requires any express language regarding firearms to be included in a statute in order for that statute to fall within the predicate exception." 524 F.3d at 399-400.

Defendants also mistakenly attempt to expand the Ninth Circuit's holding in *Ileto*. There, the court said that "the predicate exception cannot sensibly be interpreted to 'cover[] all state statutes that *could be applied* to the sale or marketing of firearms.'" Defs.' Br. at 17 (emphasis in original). The Ninth Circuit went on to point out that "the examples suggest that [d]efendants' asserted narrow meaning is incorrect, because some of the examples do not pertain exclusively to the firearm industry." *Ileto*, 565 F.3d at 1134.[3]

In addition to Defendants' attempt to expand the holdings of *City of New York* and *Ileto*, Defendants ignore the various rulings that have held a state's Unfair Trade Practices Act can serve as a predicate statute. First, the *Soto* court allowed claims to move forward under the Predicate

---

[3] Similarly to the Defendants here, who argue that "the predicate exception applies only to claims under laws that specifically regulate firearms *in particular*" (Defs.' Br. at. 15), the defendants in *Ileto* argued that "the predicate exception would be met only if a plaintiff alleged a knowing violation of a statute that pertained *exclusively* to the sale or marketing of firearms." *Ileto*, 565 F.3d at 1134 (emphasis in original).

Exception where the statute alleged to have been violated was Connecticut's Unfair Trade Practices Act (CUTPA). *See Soto*, 331 Conn. at 157-58. The Connecticut statute prohibited unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. The *Soto* court specifically found that "[r]eading the predicate exception to encompass actions brought to remedy illegal and unscrupulous marketing practices under state consumer protection laws is consistent with the approach followed by the U.S. Court of Appeals for the Second Circuit [in *City of New York*]." *Id*. at 124. *Soto* also pointed out that "the Second Circuit held that the predicate exception encompasses not only laws that expressly regulate commerce in firearms but also those that 'clearly can be said to implicate the purchase and sale of firearms,' as well as laws of general applicability that 'courts have applied to the sale and marketing of firearms….'" *Id*. at 125.

The *Soto* court also reasoned that CUTPA might "qualify as a predicate statute under the standard articulated in the Ninth Circuit's decision in *Ileto*" because the *Ileto* court "suggested that a predicate statute must either concern 'firearm[s] regulations or *sales and manufacturing regulations*.'" Thus, like with CUTPA, because South Carolina's Unfair Trade Practices Act "specifically regulates commercial sales activities and is, therefore, narrower in scope and more directly applicable than the general tort and nuisance statutes at issue in *Ileto*, it arguably qualifies as a predicate statute under the standards articulated by each of the three appellate courts to have constructed the federal statute" at the time of the *Soto* court's decision. *Id*. at 309, n. 53.

The Superior Court for San Diego County also adopted this reasoning from *Soto*, when it determined that the California Unfair Competition Law was applicable to the sale or marketing of firearms for purposes of application of the Predicate Exception. *See Goldstein v. Smith & Wesson Corp.,* Case No. 37-2020-16638-CU-PO-CTL, at 4-5 (Calif. Super. Ct. May 26, 2020), attached

15

as Ex. 5. The *Goldstein* court adopted the reasoning from *Soto*: "As stated by the *Soto* court, 'applicable' means 'capable of being applied.' Under this understanding, the UCL is applicable to the sale and marketing of a firearm." *Id.* at 4. It further notes that "[n]othing in the [Lawful Commerce Act] indicates that the predicate statutes have to exclusively apply to firearms." *Id.* at 5.

Similarly, in *Prescott*, the court, which "turn[ed] to the [Ninth] circuit's decision in *Ileto* for guidance," found that "neither [the *Ileto* decision] nor the [Lawful Commerce Act's] language, purpose, and legislative history foreclose the [Nevada Deceptive Trade Practices Act] from serving as a predicate statutory violation." *Prescott v. Slide Fire Sols., LP*, 410 F. Supp. 3d 1123, 1138 (D. Nev. Sept. 26, 2019). That statute specifically regulates the sale and marketing of goods…and "[c]onsequently, the circuit's decision in *Ileto* does not foreclose the NDTPA from serving as a predicate statute, and instead appears to permit it." *Id.* at 1138-39.

Additionally, the Indiana public nuisance statute falls squarely within the category of statutes "that courts have applied to the sale or marketing of firearms." In fact, this statute has been found to apply to the sale and marketing of firearms by the Indiana Supreme Court. *See City of Gary v. Smith & Wesson Corp. et al.*, 801 N.E. 2d 1222, 1232-33, 1235 (Ind. 2003) (*Gary I*). And, after the passage of the Lawful Commerce Act, the Indiana Court of Appeals found that Indiana's public nuisance statute satisfied the Predicate Exception. *Smith & Wesson Corp. v. City of Gary*, 875 N.E.2d 422, 430 (Ind. Ct. App. 2007) (*Gary II*).

Defendants attack this ruling because it "was based on a pre-[Lawful Commerce Act] decision by the Indiana Supreme Court." Defs.' Br. at 17, n. 4. This position makes little sense. If the Indiana Supreme Court found the Indiana public nuisance statute applicable to the sale or marketing of firearms *before* the passage of the Lawful Commerce Act, then that statute is

16

precisely one of the state statutes that the Predicate Exception was meant to encompass. And, there have been two appeals of that case—both after the passage of the Lawful Commerce Act— in which the Indiana Court of Appeals held that the Indiana public nuisance statute was applicable to the sale or marketing of firearms. 875 N.E.2d 422 (Ind. Ct. App. 2007) (*Gary II*); 126 N.E.3d 813 (Ind. Ct. App. 2019) (*Gary III*).

### C. Plaintiffs Do Not Need Standing to Sue Under a Predicate Statute in order to Validly Allege a Violation of a Statute for Purposes of the Lawful Commerce Act

Defendants argue that even if the South Carolina consumer protection act is applicable to the sale or marketing of firearms or their components, that law still fails to qualify as the basis of the predicate exception because Plaintiffs cannot bring a claim under this statute. *See* Defs.' Br. at 17-20. However, this argument fundamentally misinterprets the Predicate Exception requirements.

Plaintiffs do not assert a cause of action under the South Carolina consumer protection statute, but rather allege that Defendants are marketing and selling their products in violation of that law and cannot thereby claim immunity under the Lawful Commerce Act. Defendants can violate that state statute even if Plaintiffs cannot personally sue under it. *See Apolinar v. Polymer80, Inc.,* 2022 Cal. Super. LEXIS 2591 *9 (Cal. Sup. Ct. Feb. 2, 2022) (Plaintiff could allege violation of the Unfair Competition Law for purposes of Lawful Commerce Act without asserting a cause of action under the it), attached as Ex. 6. As long as Defendants' violation of the South Carolina Unfair Trade Practices Act caused Plaintiffs' harm, Plaintiffs' claims are not barred by the Lawful Commerce Act, because Defendants are acting unlawfully in the sale or marketing of firearms. *See id.*

To accept Defendants' interpretation of the Predicate Exception, *i.e.*, that Plaintiffs must allege not only a violation of a predicate statute, but must also establish a cause of action under that statute, this Court would necessarily have to discount the rulings of courts that found the Predicate Exception satisfied when violations of the Gun Control Act—or any other criminal

17

statute—are alleged. This is because the Gun Control Act does not create an independent, or private, cause of action. *See, e.g.*, *Bannerman v. Mountain State Pawn. Inc.*, No. 3:10-cv-46, 2010 WL 9103469 *5 (N.D.W.Va. Nov. 5, 2010) ("While the Gun Control Act imposes criminal penalties for violations of the statute, it does not explicitly create a private right of action or relief for civil liability.") (motion to dismiss granted on other grounds). And no private plaintiff would have standing to sue a defendant civilly for criminal activity. Taking this illogical argument to its conclusion, courts would not be able to find the Predicate Exception satisfied when violations of the very types of statutes listed as examples in the text of the statute were violated. This cannot possibly have been Congress' intent.

### D. Defendants' Violation of the Predicate Statutes Was the Proximate Cause of Plaintiffs' Harm

The allegations in the Second Amended Complaint are sufficient to establish proximate cause at the pleading stage. Specifically, Plaintiffs' allegations are sufficient for this Court to draw the reasonable inference that Defendants are liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The Second Amended Complaint establishes how Defendants' marketing and advertising scheme foreseeably influenced and encouraged the Shooter to use Defendant ATI's high-capacity magazine for a criminal purpose resulting in Plaintiffs' injuries. Plaintiffs have described how Defendants' negligent marketing and advertising not only appealed to but enticed the Shooter to purchase the high-capacity magazine that the Shooter used that magazine to carry out a criminal, offensive purpose, just as it was advertised to be used, and that the lethality of the attack would not have been possible without that magazine. *See* SAC ¶¶ 7, 19, 21, 29.

Rather than acknowledge the full scope of the Plaintiffs' allegations, Defendants focus on the criminal acts of the Shooter to claim a break in the causal chain. *See* Defs.' Br. at 23-25.

However, "[t]he original negligent actor is not relieved of liability unless the subsequent criminal act was unforeseeable." *Cooke v. Allstate Mgmt. Corp.*, 741 F. Supp. 1205, 1214 (D.S.C. 1990), *see also Pac. Employer's Ins. Co. v. Austgen's Elec. Inc.*, 661 N.E.2d 1227, 1229-30 (Ind. Ct. App. 1996) ("[I]f at the time of the negligent act a wrongful act is reasonably foreseeable, the intervening cause will not sever the liability of the original negligent actor."). It cannot reasonably be argued that the Shooter's use of the magazine, in a mimicry of how it was used in Defendants' advertisements, was not foreseeable. Thus, there is no break in the casual chain, and Plaintiffs have sufficiently established proximate cause at this stage.

Defendants attempt to evade liability by pointing to the Shooter and saying, "how could we know?" The answer to that question is fully set out in the Second Amended Complaint. Defendants had knowledge that mass killers are attracted to high-capacity magazines and use high-capacity magazines to perpetrate mass killings. SAC ¶ 73-74. Despite this knowledge, Defendants marketed and advertised ATI's high-capacity magazine specifically to individuals like the Shooter who had delusions of fighting a war and destroying their enemies. SAC ¶ 19. This is evidenced by Defendants' advertisements, which depict men in tactical vests and military style fatigues, engaging in offensive, tactical operations. SAC ¶¶ 126, 130, 132. The video advertisements feature the continual spray of bullets at unseen targets. *Id.* at ¶ 132. These advertisements, which are depicted and described in the Second Amended Complaint, demonstrate Defendants' calculated effort to market its high-capacity magazine for use in military style assaults, for which there is no legal purpose in the civilian market. *See* SAC ¶¶ 5, 96-97.

In addition to the video advertisements, the Second Amended Complaint further fleshes out Defendants' practice of marketing its high-capacity magazine as a military product by

deceptively labeling the packaging of the magazine as "FOR M4/AR RIFLES". SAC ¶ 117-20. The only purpose of this marketing strategy is to "deceive civilian consumers into believing they were buying the same product as used by the U.S. military" (SAC ¶ 117) which has the foreseeable consequence of encouraging the military use of such products in the civilian context.

Further, the allegations are beyond merely possible, and are instead quite plausible with respect to the claim that Defendants' negligent marketing campaign did in fact influence the Shooter's behavior. Defendants' advertisements depict men in tactical vests (SAC ¶¶ 126, 130, 132) and bear a striking resemblance to the tactical vest worn by the Shooter while he carried out the attack. SAC ¶¶ 128, 130, 142. The advertisements depict men firing a barrage of continuous gun fire using a 60-round magazine. SAC ¶¶ 126, 130, 132. The Shooter also fired a barrage of continuous gunfire using this same magazine as he was able to empty the high-capacity magazine in a matter of seconds. SAC ¶ 165.

The similarities in the videos and the attack easily allow this Court to draw a reasonable inference that the Shooter did in fact view these advertisements, and carried out the attack in their image. The Second Amended Complaint further demonstrates that the shooter was exposed to the packaging described above when he obtained his magazine. SAC ¶¶ 117-20. Finally, the Second Amended Complaint alleges how Defendants' advertisements inspired, emboldened, and empowered the Shooter to carry out his attack, and that the attack would not have been as lethal without the magazine. SAC ¶¶ 31, 121.

All of these factual allegations allow this Court to draw the reasonable inferences – required to be drawn in Plaintiffs' favor at this stage – that Defendants' negligent and deceptive marketing campaign encouraged the Shooter to obtain and use the high-capacity magazine, that the Shooter was influenced and emboldened by Defendants' advertisements and marketing, and

20

that as a foreseeable result of Defendants' marketing, the Shooter carried out an attack in a military style, with a level of lethality made possible by use of Defendant's magazine.

The *Soto* court, faced with similar marketing claims, found these allegations sufficient to establish proximate cause at the pleadings stage. In *Soto*, the plaintiffs alleged that the defendant "knowingly marketed, advertised, and promoted the [firearm] for civilians to use to carry out offensive, military style combat missions against their perceived enemies." 331 Conn. at 65-66, compare with SAC ¶ 7 (defendant's "advertising scheme…encouraged criminal use of the [high-capacity magazines] by focusing on the [high-capacity magazines'] assaultive and offensive uses), ¶ 17(f) (*sic*) (defendants "employ[ed] a marketing scheme for their HCMs that focused on the HCMs' offensive and assaultive capabilities.").

The *Soto* court found that proximate cause was established at the motion to dismiss stage because the plaintiffs there alleged that "defendants' wrongful advertising magnified the lethality of the Sandy Hook massacre by inspiring [the shooter] or causing him to select a more efficiently deadly weapon for his attack." *Soto*, 331 Conn. at 98, *compare* ("The lethality of the Attack would not have been possible without the Magazine." SAC ¶ 29; and "The high capacity of the Magazine emboldened the Shooter to commit the Attack, knowing he had the ability to fire 60 rounds continuously without the need to pause to reload." SAC ¶ 31). On considering the plaintiffs' allegation, the *Soto* court noted at the motion to dismiss stage, it had to assume this allegation could be proven, and denied defendant's motion to dismiss. *Soto*, 331 Conn. at 98.

Similarly, in *Prescott*, the court found plaintiffs' allegation that defendant's misrepresentation that its bump stock was legal "enticed users like [the shooter]…to purchase 'bump stock' devices from [defendant]." 410 F. Supp. 3d at 1140. The complaint further alleged that the defendant promoted its bump stock for "its high rate-of-fire capabilities," and that the

defendant should have then "'foresee[n] how [bump-stocks] would be misused' in the manner resulting in plaintiffs' injuries." *Id*.

Again, similar reasoning can be applied here to establish proximate cause. Plaintiffs sufficiently allege that Defendants "enticed" users, including the Shooter, to purchase magazines from Defendants, these high-capacity magazines were promoted for their ability to fire 60-rounds in a short period, and thus Defendants could foresee how its high-capacity magazines would be misused in a manner resulting in Plaintiffs' injuries.

### III.    Indiana's Firearms Immunity Statute Does Not Apply to Plaintiffs' Claims

To the extent Defendants' motion engages in a choice of law analysis, the outcome is irrelevant, because Indiana's Firearms Immunity Statute (the "Indiana Immunity Statute"), the statute that Defendants claim precludes Plaintiffs' claims, does not apply, and South Carolina has no similar statute.

First, the Indiana Immunity Statute only covers manufacturers or sellers of firearms or ammunition—**not "component parts" of** firearms. *See* Ind. Code § 34-12-3-3. So, the Indiana Immunity Statute cannot apply to this case involving the sale and marketing of a magazine, which no one is arguing is a firearm or ammunition.

Additionally, Defendants' argument that the case is barred by the Indiana Immunity Statute fails for the same reasons the case is not barred by the Lawful Commerce Act: because Defendants' conduct was not lawful. In the Indiana Immunity Statute, two complementary provisions shield firearms manufacturers and sellers from being held accountable for damages or injunctive relief caused *not by their own misconduct*, but by another's wrongful acts. Ind. Code § 34-12-3-3(1),(2). Subsection 3(1) bars suits against firearm sellers for the "recovery of damages resulting from, or injunctive relief or abatement of a nuisance relating to, the *lawful*:

(A) design; (B) manufacture; (C) marketing; or (D) sale; of a firearm or ammunition for a firearm." Ind. Code § 34-12-3-3(1). Subsection 3(2) precludes the "recovery of damages resulting from the criminal or unlawful misuse of a firearm or ammunition for a firearm by a third party." Ind. Code § 34-12-3-3(2). Nowhere did the Indiana General Assembly state that firearm companies may not be held accountable for their own wrongful actions.

Though Defendants focus their argument for immunity on subsection 3(2), the appropriate subsection is actually subsection 3(1) which relates to marketing claims such as this one. Subsection 3(1) is not applicable to this case for several reasons. First, Plaintiffs' claims relate to Defendants' marketing of its high-capacity magazine. Second, even assuming arguendo, that the magazine was a component part of a firearm, the Indiana Immunity Statute still would not apply because it encompasses only the sale or marketing of "a firearm or ammunition for a firearm." Ind. Code § 34-12-3-3.

Even if the sale or marketing of the magazine were to be covered by the Indiana Immunity Statute—which it is not—Defendants still would not be afforded immunity. "By its own terms, Subsection 3(1) of the Immunity Statute does not bar an action for recovery of damages resulting from, or injunctive relief or abatement of a nuisance relating to, the *unlawful* design, manufacture, marketing, or sale of a firearm." *Gary III,* 126 N.E.3d 813, 828 (Ind. App. Ct. 2019) (emphasis in original). In *Gary III*, the parties agreed that "'unlawful' conduct in this context is conduct that violates a statute, ordinance or regulation…" *Id.* The *Gary III* court found that the Indiana Immunity Statute did not bar recovery for claims in which unlawful conduct was alleged. *Id.* at 829-32. Because Plaintiffs' claims arise out of Defendants' unlawful marketing, Defendants do not enjoy the immunity provided by the Indiana Statute.

For the foregoing reasons, the Indiana Immunity Statute does not protect Defendants

from liability here. Thus whether South Carolina law or Indiana law is applied, Defendants' motion to dismiss must be denied.

### IV.    Defendant Calabro is Subject to Specific Personal Jurisdiction in South Carolina

This Court's ability to exercise personal jurisdiction over Defendant Calabro is controlled by South Carolina's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350-51 (4th Cir. 2020). Because South Carolina's long-arm statute is coextensive with the Due Process Clause, *Cockrell v. Hillerich & Bradsby Co.*, 363 S.C. 485, 491 (2005), the two requirements merge into one. *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 391 (4th Cir. 2012). In this consolidated analysis, the Court "must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019).

As explained below, this Court can exercise specific personal jurisdiction over Calabro.[4] Whether specific personal jurisdiction exists is a three-prong test that looks to "(1) the extent to which the defendant purposefully availed [him]self of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers*, Inc., 334 F.3d 390, 397 (4th Cir. 2003) (cleaned up).

### A. As the marketing director of a Summerville-based company, Calabro purposefully availed himself to the privileges of conducting activities in South Carolina.

The purposeful availment prong asks whether Calabro "engaged in significant activities within" or "created continuing obligations [with] residents of" South Carolina. *Doe 9 v. Varsity*

---

[4] Plaintiffs do not argue that Calabro is subject to general personal jurisdiction in South Carolina.

*Brands, LLC*, 679 F. Supp. 3d 464, 489 (D.S.C. 2023) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985)). This prong "is not susceptible to a mechanical application," and there is no exhaustive list of applicable factors; rather, what matters is the "*quality* and *nature* of the defendant's connections" to the forum state. *UMG Recordings, Inc.*, 963 F.3d at 352 (emphasis in original). Put simply, Plaintiffs must show that Calabro's conduct "connects him to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

As set out in the Second Amended Complaint, Calabro's South Carolina ties are significant. Calabro is the Director of Marketing and Purchasing for American Tactical, a company based in Summerville, South Carolina. SAC ¶ 50. Calabro "oversees and directs American Tactical's marketing, including on its social media platforms." *Id*. "All marketing, promotional and advertising materials worked on by Calabro on behalf of ATI are sent to ATI executive officials in South Carolina for review and approval before being published." *Id*. In other words, Calabro spends every workday—and earns his living—overseeing and directing the marketing activities of a South Carolina-based company. This constitutes purposeful availment to South Carolina. *See Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (purposeful availment prong is satisfied when defendant "deliberately engage[s] in significant or long-term business activities in the forum state").

Defendants cite a string of out-of-district cases for the principle that "remote employment by a single employee, alone, is insufficient to constitute purposeful availment" by an employer. Defs.' Br. at 32. Even if this were the law, it does not control the outcome here, where Plaintiffs seek the opposite: to sue Calabro, a remote employee, in his *employer's* home state. There is an intuitive difference. A company may have many employees, and it cannot always control where workers live and travel. Accordingly, a remote employee's mere presence in a forum state doesn't

25

necessarily imply their employer's intent to conduct activities there. *See Hanson v. Denckla*, 357 U.S. 235, 253 ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.")  An employee, in contrast, makes a voluntary, deliberate choice of what employer to work for. In making this decision, the employee accepts the benefits and burdens of conducting business in their employer's home state—even if they choose to work remotely. *See Walden*, 571 U.S. at 285 ("[P]hysical presence in the forum is not a prerequisite to jurisdiction[.]"); *see also Perdue Foods LLC*, 814 F.3d at 191 ("We recognize that physical presence in the forum state is not essential [to establish purposeful availment].").

Indeed, courts hearing employment disputes routinely find that a remote worker has purposefully availed themselves to their employer's home state, based on in-state ties that resemble Calabro's ties to South Carolina. *See, e.g., M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 492-94 (E.D. Pa. 2021) (New Jersey-based remote employee purposefully availed self to Pennsylvania, when employee "continued to work" for employer after it relocated to Pennsylvania); *Travel Leaders Leisure Grp., LLC v. Cruise & Travel Experts, Inc.*, No. 19-cv-02871, 2020 WL 4604534, at *10 (D. Minn. Aug. 11, 2020) (exercising personal jurisdiction over out-of-state remote employee based, in part, on manager's "extensive, 'daily' communication with Minnesota-based" employees); *Opus Fund Servs. (USA) LLC v. Theorem Fund Servs., LLC*, No. 17 C 923, 2017 WL 4340123, at *4 (N.D. Ill. Sept. 29, 2017) (exercising personal jurisdiction over tort claims against out-of-state remote employee, when employee "communicate[d] regularly with her supervisors… and others in Opus' Naperville [Illinois] office").

With remote work on the rise, Defendants' mechanical application of the "purposeful availment" prong would make it difficult, if not impossible, to sustain a lawsuit against any

company with geographically dispersed employees. The eight "factors" cited in Defendants' brief—which, Defendants rightly concede, are "nonexclusive" anyway—were devised before Zoom, Microsoft Teams, and other telework options revolutionized the way Americans do business. While these technologies bring valuable changes for employers and workers, they should not alter a basic truth: that a defendant who directs and oversees tortious and/or unlawful activities in a certain state is subject to specific personal jurisdiction there. Because Calabro directs and oversees tortious and unlawful advertisements that are produced in South Carolina, he has purposefully availed himself to the privileges of conducting activities in this forum.

### B. Plaintiffs' claims arise out of and relate to ATI's advertisements, which are promulgated—with Calabro's direct involvement—out of ATI's South Carolina headquarters.

The next prong asks whether Plaintiffs' claims "arise out of or relate to" Calabro's ties to South Carolina. *Doe 9*, 679 F. Supp. 3d at 489. Like purposeful availment, this prong is resolved by the plain text of the pleadings. The Second Amended Complaint describes Calabro as the creative force behind ATI's advertisements, which Calabro "sends…to ATI's executive officials in South Carolina for review and approval[.]" SAC ¶ 50. The Complaint also recounts how Calabro's advertisements target "impulsive young men…who have militaristic delusions of fighting in a war or a video game." *Id*. at ¶ 15. Tying it all together, the Complaint explains that Calabro caused Plaintiffs' harms by "intentional[ly] marketing… HCMs in a fashion reasonably likely to appeal to dangerous classes[.]" *Id.* ¶¶ 182, 197, 212, 247, 284, 299, 336, 351, 364. In other words, this lawsuit arises out of and relates to ATI's marketing decisions, which are directed, albeit remotely, by Calabro through communications with ATI's South Carolina headquarters.

Defendants raise three arguments on this prong. None is persuasive.

27

First, Defendants say Plaintiffs fail to allege that Calabro "engage[d] in an[] 'advertising scheme' directed specifically at South Carolina customers." Defs.' Br. at 33-34. That argument misses the real point. ATI's promotional materials may be distributed nationwide, but they are produced, fine-tuned, and finalized by ATI in South Carolina, with Calabro participating remotely. Calabro Decl., Dkt. 30-1 ¶¶ 5-6.

Second, Defendants dismiss Calabro's South Carolina ties as a coincidence, reasoning that "if ATI's offices were in any other state, then Calabro would submit his work there." *Id.* at 34. Again, that claim is missing the key point. If Calabro's advertisements were produced at an ATI headquarters in Chicago, then personal jurisdiction might be proper in Illinois; if Calabro submitted his work to an ATI office in Boise, then Plaintiffs could have brought this suit in Idaho. Because Plaintiff's claims arise out of and relate to Calabro's advertisements, personal jurisdiction is appropriate in the state where the advertisements are produced: South Carolina.

Finally, Defendants chide Plaintiffs for not asserting a causal relationship between their injuries and Calabro's South Carolina ties. *Id.* But personal jurisdiction exists when the plaintiff's harms "arise out of *or* relate to the defendant's contacts with the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (cleaned up and emphasis added); *accord Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021) ("None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do [to establish personal jurisdiction]"). Plaintiffs weren't injured in South Carolina or harmed by a South Carolina-purchased HCM, but the conduct that caused their injuries—ATI's advertisements—has taken place and continues to take place at ATI's headquarters in Summerville. *See id.* at 365-66 (upholding exercise of personal jurisdiction over car company that sold and marketed cars in forum state, even though the cars that caused plaintiffs' injuries were purchased outside the forum state).

28

### C. Exercising personal jurisdiction over Calabro in South Carolina is reasonable.

At the third prong, the burden shifts to Calabro to "establish, despite the presence of minimum contacts, 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *ESAB Grp., Inc.*, 685 F.3d at 393 (quoting *Burger King Corp.*, 471 U.S. at 478). The purpose of this prong is to prevent litigation "so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 135 (4th Cir. 2023) (cleaned up). Defendant Calabro cannot meet this "heavy burden," *Doe 9*, 679 F. Supp. 3d at 478, for four reasons.

First, the burden of litigating in South Carolina is slight. While Calabro lives in New York, his employer—with whom he shares counsel—is based here. See *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 296 (district court's exercise of personal jurisdiction was reasonable because defendant conducted business with an in-state corporation and retained qualified counsel). Moreover, the Fourth Circuit has permitted courts to exercise specific personal jurisdiction over defendants based in far-flung destinations like Dubai, *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 303 (4th Cir. 2012) (finding exercise of personal jurisdiction reasonable in light of defendant's "ability to secure counsel in the forum state and its choice to do business with a forum resident"), and India, *CFA Inst.*, 551 F.3d at 296 (finding court's exercise of specific personal jurisdiction reasonable, even though "[defendant's] location in India may present unique challenges"). South Carolina may not be the *most* convenient forum for Calabro, but it is plainly a reasonable one under the facts here. *See Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 217 (4th Cir. 2001) ("Although defending a lawsuit in North Carolina was, without doubt, inconvenient for [Arizona-based

defendant], the inconvenience was not so grave as to offend constitutional due process principles.").

Second, South Carolina has an interest in hearing this dispute, which involves alleged misconduct by a South Carolina company and involves the proper application of South Carolina law. Defendants' allegedly tortious and unlawful advertisements are directed at susceptible young people across the country, including in South Carolina. *Cf. id.* at 218 ("Surely, North Carolina's interest in deterring trademark infringement is implicated by the postings of allegedly infringing materials by a North Carolina resident to a website accessible through a North Carolina-based domain."). While the tragic shooting that prompted this litigation took place in Indiana, South Carolina has a strong interest in preventing future violence, both in-state and abroad.

Third, the interstate judicial system's interest in efficient resolution is best served by having Plaintiffs bring their claims in a single forum. The alternative—one lawsuit in South Carolina, another in New York—would waste judicial resources and create the risk of inconsistent judgments. *See Smith v. Teledyne Cont'l Motors, Inc.*, 840 F. Supp. 2d 927, 934 (D.S.C. 2012) (finding exercise of personal jurisdiction was reasonable, in part, because dismissing out-of-state defendant would lead to "equally complex suits for contribution and indemnity in other courts in other states").

## D. Subjecting Calabro to personal jurisdiction in South Carolina is fully consistent with due process.

Separately, Defendants make a novel argument based on the U.S. Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Co.*, 582 U.S. 255 (2017) ("*BMS*"). As Defendants see it, that case declared a broad, unqualified rule: personal jurisdiction is unavailable when plaintiffs "are not residents of the forum state, do not claim to

have suffered harm in that state, and all 'conduct giving rise to [their] claims occurred elsewhere.'" Defs.' Br. at 35 (quoting *BMS*, 582 U.S. at 265). Defendants are wrong, for three reasons.

First, *BMS* concerns personal jurisdiction in state court, and explicitly "le[ft] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." 582 U.S. at 269. Even if *BMS* announced a new rule, it would not necessarily apply in this federal forum.

Second, Defendants' summary of *BMS* omits a crucial fact. The drug in that case, Plavix, was designed and marketed by BMS employees in New York—not California, the forum state. *Id.* at 259. This case, in contrast, is about advertisements that Calabro creates by virtue of his employment at South Carolina-based ATI (albeit remotely from his home office).

Third, and finally, Defendants overstate *BMS*' holding. Instead of announcing a standalone rule, the *BMS* Court reiterated the old principle that personal jurisdiction requires "a connection between the forum and the specific claims at issue." *Id.* at 265. Here, Plaintiffs have demonstrated that connection by laying out the nexus between ATI's advertisements (created by Calabro) and Plaintiffs' harms.

### E. At minimum, this Court should permit jurisdictional discovery on the extent of Calabro's contacts with South Carolina.

Make no mistake, Defendant Calabro is subject to specific personal jurisdiction in South Carolina. But if this Court is unsure about this conclusion, dismissal is not the appropriate course of action. Instead, this Court should order limited discovery regarding Calabro's ties to South Carolina.

"When the Plaintiff's claim does not appear to be frivolous, a district court should ordinarily allow discovery on jurisdiction in order to aid the Plaintiff in discharging the burden of establishing the court's jurisdiction." *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 143 F.R.D. 628,

644 (D.S.C. 1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993). Courts in this Circuit routinely permit limited discovery to resolve jurisdictional questions. *See, e.g. Informaxion Sols., Inc. v. Vantus Grp.*, 130 F. Supp. 3d 994, 999 (D.S.C. 2015) (granting discovery on personal jurisdiction and subject matter jurisdiction); *Batts v. SNAP Inc.*, No. 2:23-cv-03565, 2024 WL 3677802, at *9 (D.S.C. Aug. 6, 2024) (granting discovery on personal jurisdiction); *Gibbs v. Plain Green, LLC*, 331 F. Supp. 3d 518, 530 (E.D. Va. 2018) (granting discovery regarding defendant's sovereign immunity defense).

To be sure, jurisdictional discovery is inappropriate "[w]hen a plaintiff offers only speculation or conclusory assertions about contacts with a forum state[.]" *Carefirst of Maryland, Inc.*, 334 F.3d at 402. Here, however, Plaintiffs have articulated a concrete explanation of why Calabro is subject to personal jurisdiction in this forum: Calabro remotely directs and controls ATI's marketing operations, which are carried out in South Carolina. While hard evidence of Calabro's South Carolina ties is not required at this stage of litigation, *see Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016) (explaining that a plaintiff "need only make a *prima facie* showing of personal jurisdiction" at the motion to dismiss stage), discovery would clear up any doubts this Court might have about exercising personal jurisdiction over Calabro.

## CONCLUSION

For the aforestated reasons, Defendants' Motion to Dismiss must be denied in its entirety.

Respectfully submitted,

Dated: November 12, 2024.          */s/ Elizabeth Middleton Burke*

Elizabeth Middleton Burke, Esq. (Fed. ID 7466)
Christiaan A. Marcum, Esq. (Fed. ID 7556)
**ROGERS, PATRICK, WESTBROOK & BRICKMAN**
1037 Chuck Dawley Blvd., Bldg. A
Mount Pleasant, SC 29464
Ph. (843) 727-6500
bburke@rpwb.com
cmarcum@rpwb.com

Leslie M. Kroeger, Esq. (Admitted *pro hac vice*)
Poorad Razavi, Esq. (Admitted *pro hac vice*)
Rachael Flanagan, Esq. (Admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL**
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Ph. (561) 515-1400
lkroeger@cohenmilstein.com
prazavi@cohenmilstein.com
rflanagan@cohenmilstein.com

Jay Chaudhuri, Esq.
(Admitted *pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL**
407 North Person Street
Raleigh, NC 27601
jchaudhuri@cohenmilstein.com

Douglas N. Letter, Esq. (Admitted *pro hac vice*)
Philip H. Bangle, Esq. (*pro hac vice pending*)
Jenna Tersteegen, Esq. (Admitted *pro hac vice*)
**BRADY UNITED AGAINST GUN VIOLENCE**
840 First Street NE, Ste. 400
Washington, DC 20002
dletter@bradyunited.org
pbangle@bradyunited.org
jklein@bradyunited.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served via CM/ECF

service upon all counsel of record this the 12th day of November 2024.

*/s/ Elizabeth Middleton Burke*